**UNITED STATES of America**

v.

**George BARROW, a/k/a "Skinny Barrett," et al.**

**Crim. No. 20997.**

United States District Court
E. D. Pennsylvania.

April 29, 1964.

Drew J. T. O'Keefe, U. S. Atty., Philadelphia, Pa., Thomas M. McBride, George Robert Blakey, Sp. Attys., Dept of Justice, Washington, D. C., for plaintiff.

Morton Witkin, Witkin & Egan, Philadelphia, Pa., for defendant George Barrow.

Samuel R. Liever, Liever, Hyman & Potter, Reading, Pa., for defendant Benny Bonanno.

Stanford Shmukler, Poplow & Shmukler, Philadelphia, Pa., for defendant Frank Loscalzo.

Angelo D. Malandra, Camden, N. J., for defendants Pasquale Pillo, Fred DiPatrizio, Rocco Grassi, Charles Hunt, John Marzilli, Joseph Mattia, Michael Recchia, Querino Dentino.

Louis Lipschitz, Philadelphia, Pa., for defendant Anthony LaMonica.

James F. Masterson, Philadelphia, Pa., for defendant Dominick DiCaprio.

JOSEPH S. LORD, III, District Judge.

There were originally in this case a total of fifteen defendants. All were indicted for conspiracy (Title 18 U.S.C.A. § 371) to violate 18 U.S.C.A. § 1952.[1] Nine of the defendants were indicted for the violation of § 1952; five were indicted for wilfully causing and aiding and abetting the unlawful interstate travel (18 U.S.C.A. § 2); one, Comito, was indicted only for conspiracy.

 Comito was severed, and the case went to trial against the other fourteen defendants. The trial judge acquitted Gatto at the end of the government's case. The jury acquitted Grassi. DiCaprio died a few weeks after the ver-

---

1. "(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to— * * *

"(3) Otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

"(b) As used in this section 'unlawful activity' means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion or bribery in violation of the laws of the State in which committed or of the United States. * * * *"

dict.[2] The eleven remaining defendants were convicted under the first count of conspiracy. Barrow, Loscalzo, Bonanno and Pillo were found guilty of the substantive offenses charged in Counts 3–11 and 15–26, inclusive (see footnote 1, supra). The trial judge dismissed Count 2 and the jury found all defendants not guilty on Counts 12, 13 and 14. Mattia and Hunt were found guilty only on count 1. The jury found the remaining defendants guilty of the substantive offenses charged against them. Motions for judgment of acquittal or for a new trial are now before us.

## I. MOTIONS FOR JUDGMENT OF ACQUITTAL

These motions are based upon two main grounds: (1) That § 1952 is not intended to cover the type of activity charged against defendants, and if so, it is unconstitutional; (2) the evidence is insufficient to sustain the convictions. We have already determined the first ground against the contentions of defendants. United States v. Barrow, et al., 212 F.Supp. 837 (E.D.Pa., 1962). We pass, then, to the second ground, the sufficiency of the evidence.

The evidence indicated that Barrow's position was a supervisory one. Pillo, DiPatrizio and Mattia were "laddermen".[3] Marzilli, Hunt and Recchia were "dealers". LaMonica and Dentino were "luggers".[4] Loscalzo was a doorman. Bonanno was a part time doorman and carried money from the bank to the game.

In determining the sufficiency of the evidence to sustain conviction on the first count (conspiracy), we must examine the evidence in the light most favorable to the government, recognizing and respecting the right of the jury to draw inferences. United States v. Kensil, 195 F.Supp. 115 (E.D.Pa., 1961), affirmed 295 F.2d 489 (C.A. 3, 1961), cert. den. Haith v. United States, 368 U.S. 967, 82 S.Ct. 439, 7 L.Ed.2d 396 (1962). Circumstantial evidence need not be inconsistent with every conclusion save that of guilt; it need only establish a case which is sufficient to convince the jury beyond a reasonable doubt. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954), rehearing den. 348 U.S. 932, 75 S.Ct. 334, 99 L.Ed. 731 (1955). United States v. Giuliano, 263 F.2d 582 (C.A. 3, 1959).

This case is like United States v. Zambito, 315 F.2d 266 (C.A. 4, 1963), cert. den. 373 U.S. 924, 83 S.Ct. 1524, 10 L.Ed.2d 423 (1963). With the exception of Dentino and LaMonica ("luggers"), there is no denial that the evidence is sufficient that the defendants were engaged in a gambling enterprise in violation of Pennsylvania law.[5] All the defendants, with the exception of Dentino and LaMonica, were identified by one or more witnesses as workers at the game within the indictment period. Defendants' argument, like that of the defendant in Zambito, is that the government failed to prove that the defendants were aware of the interstate aspects of the unlawful activity—that the defendants knew that as part of the conspiracy, one or more defendants would travel interstate to promote or facilitate the dice game. See United States v. Horton, 328 F.2d 132 (C.A. 3, 1964); United States v. Crimmins, 123 F.2d 271 (C.A. 2, 1941).

*New Jersey Defendants*

There is no doubt of the knowledge of those defendants who traveled regularly

---

2. A criminal action abates when a defendant dies. Crooker v. United States, 325 F.2d 318 (C.A. 8, 1963); United States v. Safeway Stores, 140 F.2d 834 (C.A. 10, 1944). There is no final judgment in a criminal case until sentence is rendered. Korematsu v. United States, 319 U.S. 432, 63 S.Ct. 1124, 87 L.Ed. 1497 (1943).

3. A man who oversees the game at each table from the vantage point of a chair placed on a stand.

4. Those who drive customers to the game.

5. 18 P.S. §§ 4603, 4605, 4606.

from New Jersey to Pennsylvania to participate in the game as workers that interstate travel was an element of the gambling enterprise. At the very least, each knew that his own travel to the game was necessary to enable him to participate. The evidence is sufficient for the jury to find that they traveled with the intent to promote or facilitate the game by working in it.

The knowledge of Barrow, Bonanno and Loscalzo (Pennsylvania defendants) of the interstate travel of employes in furtherance of and as part of the conspiracy has also been shown by sufficient evidence.

" * * * Proof of the requisite knowledge and intent on the part of the conspirators need not be made by direct evidence. Indeed, it is a rare case in which such evidence may be found. The conspiracy may be shown by circumstantial evidence or permissible inferences or deductions from the facts. * * *" United States v. Zuideveld, 316 F.2d 873, 878 (C.A. 7, 1963).

### Barrow

There was testimony indicating that Barrow was the top man on the chain of command. When the doorman was in doubt as to whether a player should be admitted, Barrow gave the word. Barrow was the final arbitrator of disputes at the tables, and was one of the few that used the "office." He took excess money from the tables and when the game at one table ended he brought the money from the table into the office. Barrow hired the one "lugger" who testified. This fact, together with the evidence of his supervisory role, gives rise to a permissible inference that he was the one who hired the other "luggers", and other employes, including those from New Jersey. Working together with the New Jersey employes intermittently for two years, staying in the Berkshire Hotel in Reading during period parallel to the stay of the New Jersey defendants in the Daniel Boone Hotel, Barrow was familiar with these employes. It would be almost impossible to conclude that Barrow had no knowledge of the travel by employes of the game from New Jersey to Reading, Pennsylvania.

The court in Zambito pointed out that "Zambito knew that the writers under the Snyder-Fox regime had regularly done business in both states." 315 F.2d at 268. This element is not present in the present case. But in this case we have the elements of hiring "luggers" and other employes who came from New Jersey. Barrow, as one of the overmen, had extensive daily contact with the New Jersey employes. The court in Zambito relied upon daily contact and a pattern of interstate activity. These are present here. Finally, though not essential, was the announcement made by Loscalzo, the doorman, every time the witness Zangari was at the game, that cars were leaving for New Jersey. It is a fair inference that Barrow heard these announcements, audible throughout the room. If Barrow was the boss, he assigned the job of making these announcements to Loscalzo. One way or another, Barrow was aware these announcements were made. They performed the function of providing transportation to New Jersey players from the game. The soundest inference is that the paid "luggers" did the driving.

### Loscalzo

The Daniel Boone Hotel records of Loscalzo's visits parallel those of other defendants, including those from New Jersey. Loscalzo was a doorman. He paid "luggers", and it is a permissible inference that he paid New Jersey "luggers" and must have known from whence they brought their passengers. It was Loscalzo who made the announcements, before and during the indictment period, that cars were leaving for New Jersey. He admitted all customers. In testimony admissible only against Loscalzo the witness Smith testified that the defendant told him that LaMonica was a "lugger". LaMonica was a resident of New Jersey. Loscalzo had a continual association with the game. Evidence of Loscalzo's part in the conspiracy and his knowledge of the interstate aspects is sufficient.

### Bonanno

There was ample testimony placing Bonanno at the game regularly during the indictment period. Bonanno took soiled money to the bank, got change and larger denominations of bills for small bills and brought these to the premises of the dice game.

Bonanno relieved the doorman, walked around the dice game and was like an overseer. He was seen sitting with the doorman Loscalzo. He told one of the witnesses, a player, to move a car with New Jersey license plates from the vicinity of the dice game. In the spring of 1961, Bonanno helped the witness Johnson with his duties at the lunch counter. He was in a position to have heard the announcements made by Loscalzo that cars were leaving for New Jersey. From these facts the jury might well have concluded that Bonanno could not have avoided knowledge of the interstate elements of the conspiracy of which he was so obviously a part.

The issue of sufficiency of the evidence of guilt of LaMonica and Dentino is not one of knowledge of interstate travel. The evidence of their interstate travel is abundant. They were present at the game regularly over an extended period of time. The question is whether the evidence sustains a finding that they were members of the conspiracy. If the evidence sustains a conclusion that LaMonica and Dentino were employes of the dice game, the evidence of a conspiracy to violate 18 U.S.C.A. § 1952 is sufficient.

### Dentino

The evidence of Dentino's part in the enterprise is entirely circumstantial. It is, however, much more than mere evidence of association. Cf. Ong Way Jong v. United States, 245 F.2d 392 (C.A. 9, 1957). Dentino performed acts connecting him with the conspiracy which indicate he was more than a frequenter of a dice game, who voluntarily and gratuitously provided transportation for his friends. Dentino lived in Camden, New Jersey, drove to and from the game in Reading with passengers. He was seen entering the premises and in the game.

One witness testified he was a passenger in Dentino's car on several occasions. He rode from 4th and Spruce Streets, Camden, to the game in Reading with other passengers in Dentino's car. He knew Dentino only by nickname, and he had previously ridden from the same location in Camden to the game with a named co-conspirator. Both Dentino and the co-conspirator had left 4th and Spruce Streets about the same time. The witness never paid for his transportation— a 60-mile trip each way—and never spoke to Dentino about the latter's connection with the game. The little conversation in the car was dice game small talk. The witness knew only the nicknames of his fellow passengers. There is evidence that other "luggers" were paid for their services.

Another witness had seen Dentino work at the dice tables. Dentino had a long and frequent association with a dealer at the game, Marzilli. We must agree with the government that the jury was entitled to conclude that one giving friends a ride to a dice game would not regularly leave from a set place at a designated time, travel 120 miles a night, without his "friends" sharing the expenses—"friends" who knew neither each other nor him, nor spoke about anything but dice.

The conclusion that Dentino was connected with the dice game as a "lugger" and not as a player is well supported.

### LaMonica

The witness Wacks testified that between November 17, 1961, and January 20, 1962, he was at the game every weekend and sometimes on weekdays. During that period, with the exception of the week before the game finally closed, almost every time the witness was present he saw LaMonica at the game. The witness also saw LaMonica at the game before November 17, 1961. LaMonica told the witness he was being paid more than the Philadelphia "luggers"; that he was paid twenty-five and not twenty dollars

a night even if he brought only one player. This evidence is certainly sufficient to place LaMonica as a member of a conspiracy to violate 18 U.S.C.A. § 1952.

## II. MOTIONS FOR NEW TRIAL

1. Alleged errors other than charge errors.

LaMonica, in his new trial motion, charges that the trial judge erred in overruling LaMonica's objection to the government's leading questions to the witness Wacks concerning the statement by LaMonica that he was paid more than the other "luggers". Wacks testified that a prior answer before the grand jury relating LaMonica's statement was true and correct.

 It is within the discretion of the trial judge to permit leading questions. St. Clair v. United States, 154 U.S. 134, 150, 14 S.Ct. 1002, 38 L.Ed. 936 (1894). It was obvious to the trial judge here that Wacks was a reluctant and hostile witness. His evasiveness, contemptuous answers, and disrespect for the court nearly resulted in his being held for contempt. The witness was an attorney. His responses were too often calculated to prevent the government from obtaining testimony the witness had previously given. A witness should not have words put in his mouth. But neither should an attorney, confronted with an obviously recalcitrant witness, be confined to neutral questions. Di Carlo v. United States, 6 F.2d 364 (C.A. 2, 1925). Leading questions are prohibited in order to prevent a partisan witness from accepting suggestions from a friendly attorney. Wigmore on Evidence, § 915. When the witness is hostile leading questions are as permissible as if the witness had been called by the other side.

Wacks went further than did the witness in Di Carlo v. United States, supra. Wacks not only testified that he had previously testified to the statement before the grand jury. He went on to say that what he had previously said was true. This testimony was not admitted to impeach Wacks. It was present testimony in court of a statement by LaMonica.

The effect of Wacks' testimony is described in Slade v. United States, 267 F.2d 834 (C.A. 5, 1959), at 838–839, where the court distinguished the testimony before it from the type in the present case:

" * * * This record demonstrates that we do not have here the situation of an ex parte statement, introduced as a prior inconsistent statement and then used in the examination of the recalcitrant or hostile witness, with the witness finally affirming the truthfulness and correctness of the statement, rather than the initial, oral Court testimony. When that takes place, the statement is effectually embraced by the witness, becomes a part of his oath-supported court-given testimony subject to cross examination, and is therefore not hearsay. Feutralle v. United States, 5 Cir., 1954, 209 F.2d 159, 162; Harman v. United States, 4 Cir., 1952, 199 F.2d 34; cf. United States v. Allied Stevedoring Corp., 2 Cir., 1957, 241 F.2d 925, 932, and Di Carlo v. United States, 2 Cir., 1925, 6 F.2d 364, 368; and see McCormick, Evidence § 39 (1954). * * *"

 LaMonica next contends that his counsel was not permitted to establish the foundation of an attorney-client privilege objection to the testimony of LaMonica's admission.

An examination of pages 443–4 of the notes of testimony reveals that the statement testified to was not made by LaMonica in an attorney-client relationship. LaMonica did not come to Wacks to consult him as an attorney, and further Wacks did not testify to the information that LaMonica had volunteered on the occasion in question. Counsel for LaMonica was not cut off from his inquiry. The objection by one of the other defense lawyers went only to the unresponsiveness of the witness' answer. If there was any further information to be elicited, counsel for LaMonica abandoned it.

The defendants argue that it was error to permit the government to cross-ex-

amine the witness Wacks about identification of and conversations relating to "Benny".

The government was justified in leading the recalcitrant witness for the reasons we have given in the discussion of the admission by LaMonica.

■ The defendants' argument that the government knew that Wacks would be a recalcitrant witness has no bearing on the issue. Wacks testified that he told the attorney for the government that he did not want to testify for the government, but he also told him that he would tell the truth if he were called upon to testify (N.T. 379).

The language in United States v. Graham, 102 F.2d 436, 442 (C.A. 2, 1939), cert. den. 307 U.S. 643, 59 S.Ct. 1041, 83 L.Ed. 1524 (1939), rehearing den. 308 U.S. 632, 60 S.Ct. 68, 84 L.Ed. 526 (1939), is sufficient answer to the defendants' argument:

" * * * It was known, therefore, that he would not be a willing witness. But we see no reason why the district attorney should not have been privileged to believe that when the witness was actually required to testify under oath he would again tell what the attorney believed to be the truth as he had testified before notwithstanding his attempt to dissuade the attorney from calling him again. It was not within the province of the witness, having knowledge of material facts, to decide whether he would give those facts in evidence or not. He was subject to call as a witness and when so called was bound to disclose his knowledge truthfully in response to proper questions. He did not occupy the position of one who had never given the prosecutor any assurance of what facts material to the prosecution he did actually know. He had already testified to those facts twice and his willingness, when placed where he had to tell the truth or be subject to the rigors of the law respecting perjury, to persist in his refusal to testify substantially as he had before may well have surprised the examiner. It was one thing to threaten not to testify and quite another to carry out the threat when actually put to the test. * * *"

■ The attack on the cross-examination of the witness Wacks about conversations with Loscalzo has no merit. In addition to the reasons given in the treatment of LaMonica's admission, we point out that the questions and answers on this subject matter were stricken at the request of defendant's counsel. The court fully instructed the jury, at various stages of the proceedings, on the effect of granting a motion to strike.

■ The defendants charge it was error to permit F.B.I. Agent Aldrich to testify to an interview with the defendant Grassi held after the F.B.I. raided the dice game. Grassi was acquitted by the jury. The jury was instructed to consider Grassi's statement to the agent as evidence only against the defendant Grassi.

■ The trial judge erred, say the defendants, in permitting the witness Stieff to testify to conversations with John Mainwaring because there was inadequate proof that Mainwaring was a co-conspirator. We disagree. The evidence clearly connects Mainwaring, whom Stieff said was known as "Brick", with the conspiracy. Mainwaring was a guest at the Daniel Boone Hotel during the two-year period the game was in operation, seen with the defendants, and seen as a part-time dealer at the dice game. The statement was made in furtherance of the conspiracy to secure favorable hotel rates for employes of the game who were arriving from New Jersey.

■ The defense has attacked testimony of statements by Loscalzo on the ground that the witnesses failed to identify sufficiently the defendant Loscalzo.

It is clear (N.T. 1049–1051) that the witness LaBataglia did identify Loscalzo after he stepped down from the witness stand and was able to see the diminutive defendant. Further, the witness had de-

scribed the person whom he saw act as one of the two doormen. Loscalzo was identified as the doorman by numerous witnesses. On cross-examination (N.T. 1074) the witness attributed to Loscalzo the statement that was admitted.

The witness DiGaetano testified that Frank Loscalzo was the doorman. When asked to identify the defendants the witness could not individuate Loscalzo from the other defendants, all of whom he said he saw at the game. The witness did identify a picture of Loscalzo as being Frank Loscalzo, the doorman. There is no question that the photograph the witness identified as Loscalzo was a picture of the defendant Loscalzo. Any question remaining of the connection between the defendant Loscalzo and Frank Loscalzo the doorman about whom the defendant spoke, shown in G–45, was for the jury. Shaffer v. United States, 24 App.D.C. 417, cert. den. 196 U.S. 639, 25 S.Ct. 795, 49 L.Ed. 631 (1905).

The defendants urge that the witness Smith should not have been permitted to testify to conversations with the doorman about "luggers", because he was unable to identify the doorman with whom he had the conversation. The witness Smith could not pick out Loscalzo from the two rows of defendants. He did describe the doorman as about 60 years old, short and with small features—an accurate description of defendant Loscalzo—and then said that a picture of Frank Loscalzo shown to him looked like the doorman. This together with the testimony of other witnesses that the defendant Frank Loscalzo was the doorman, relieved sometimes by Benny Bonanno (certainly not to be mistaken for Loscalzo), was sufficient to enable the jury to conclude that the defendant Loscalzo made the statements attributed to the doorman and the man in the photograph (G–45).

It cannot escape notice that a few witnesses had difficulty identifying Loscalzo in court. One who eventually did said

that it was because of the location of defendant's seat. Loscalzo was short and seated in the second row behind the larger defendants. This courtroom setting was obvious to the jury who also saw G–45 and Loscalzo.

▉ Defendants attack the admissibility of the testimony of a certain witness as "fruit of the poisoned tree." Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).[6]

*Witness Goetz*

The testimony of the witness Goetz should not have been suppressed as the fruit of a poisoned tree. The witness' *identity* was not "fruit". The statement of the attorney for the government made it abundantly clear that the government was led to Goetz by independent nontainted means. See Costello v. United States, 365 U.S. 265, 81 S.Ct. 534, 5 L.Ed. 2d 551 (1961).

It was made clear that the witness' presence at the game the night of the raid was not the motivating force in his testifying when he said on cross-examination that he would have told the truth had he not been seen during the raid.

*Witness Smith*

The defendants attack the testimony of Smith on the same grounds. The attack has no merit for the same reasons. The witness' answer to the defense attorney that he would not have testified had he not been in the raid was obviously the result of a series of confusing questions (N.T. 1609–1611). When asked by the government whether he would have testified without having been seen at the raid, he answered "yes." The court chose to believe that this answer was accurate (N.T. 1612).

*Witnesses LaBattaglia and Thomas*

▉ The defendants' attempt to attack the testimony of witnesses LaBattaglia and Thomas on the grounds that their identity and testimony were products of an illegal search and seizure is equally without merit. These witnesses

6. We held that a raid on the game by the F.B.I. was illegal. United States v. Barrow, et al., 212 F.Supp. 837 (E.D.Pa., 1962).

were detained *before* the illegal entry of 237 Cherry Street and outside the room that was illegally entered (N.T. 999, 1005–6, 1124, 1131). It is clear that the identity and testimony of these witnesses could in no way be said to be the product of the illegal entrance. There is, with respect to them, no exploitation of the illegality. Wong Sun v. United States, supra

None of the defendants was prejudiced by the joinder with the others. The trial judge exhorted the jury at various stages in the proceedings to consider each defendant individually. Testimony admissible as to only one defendant was clearly limited. See Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954). The defendants rejected an offer to submit a chart of their seating positions to the jury. Apparently, they were confident that the jury would consider the government's case against each defendant separately. The jury did, in fact, acquit one defendant. This is an indication that all were not "roped in" merely because all sat in the same courtroom.

2. Alleged errors in the charge.

Preliminarily, it should be pointed out that there was only one exception to the charge, not germane to any matter now argued. Hence, alleged errors therein are not grounds for a new trial unless they constitute fundamental error. F.R. Crim.P. 30; 52(a); Knapp v. United States, 311 F.2d 71 (C.A. 5, 1962). With this principle in mind, we pass to a consideration of the alleged charge errors.

There is no merit to defendants' complaint that we failed to instruct the jury that acts and declarations of alleged co-conspirators made before November 16, 1961, were not admissible against other defendants. Once there is proof aliunde of the existence of the conspiracy, any act or declaration of a co-conspirator made during and in furtherance of it is admissible against all other co-conspirators. See generally 72 Harv. L.R. 986–987 (1959). The "pendency" of the conspiracy relates to the period during which the conspiracy, in fact, existed and is not restricted to the period charged in the indictment. In United States v. Dennis, 183 F.2d 201 (C.A. 2, 1950), Judge Learned Hand said, at page 231:

" * * * There can be no logical reason for limiting evidence to prove that the defendants were in a conspiracy between 1945 and 1948 to the period of the charge; if they were in the conspiracy earlier, declarations of any one of them or of any other person acting in concert with them are as competent as those made within the period laid. Whether they are relevant depends upon how far they form a rational support for believing that the conspiracy continued to 1945; but it is nonsense to say that events occurring before a crime, can have no relevance to the conclusion that the crime was committed; and declarations are no different from any other evidence. How far back of the commission of the crime one may go is a matter of degree, and within the general control of the judge over the relevancy of evidence. In the case at bar, there is not the least reason to hold that his discretion was abused. The same doctrine applies to evidence occurring before the acts charged had become a crime at all: * * * Just as in the case of events occurring before the dates laid in the indictment, so events occurring before the conspiracy had become a crime, may have logical relevance to the conclusion that the conspiracy continued until after 1940. * * * "

LaMonica complains that the charge permitted conviction merely on the basis of Wacks' testimony concerning defendant's statement relating to his compensation. This attack seems to be two-pronged.

(1) Wacks did not fix the time at which this statement was made by LaMonica, and therefore it could have been made before November 17, 1961. The statement was admissible as an ex-

ception to the hearsay rule—an admission. It is well settled that evidence relating to occurrences before the earliest date in the indictment has probative value, e. g., Heike v. United States, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450 (1913); United States v. Dennis, 183 F.2d 201 (C.A. 2, 1950), affirmed 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). Evidence of events occurring prior to the enactment of the statute upon which the indictment is based is likewise relevant and admissible. Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1910).

■ (2) An uncorroborated admission will not support a conviction. The plain answer to this argument is that when the charge is read as a whole, as it must be, it is obvious that it did not permit the jury to convict solely on the basis of an uncorroborated admission. We had previously referred to the surveillance and identification testimony concerning Dentino, the other "lugger" defendant. As to LaMonica, we said:

"As to the other alleged lugger, LaMonica, there is the same type of evidence that I have just mentioned as to Dentino, with one addition that I can think of, and that is an alleged statement by LaMonica that he fared better than the Philadelphia luggers because he got, I think he said, $25 a night. Now, you will consider the source of that testimony. That came from the witness Wacks. I have said to you that you are the sole judges of these facts and of the credibility of the witnesses. If the testimony of Wacks convinces you beyond a reasonable doubt, after weighing his credibility and all of the factors I have given to you, his demeanor and everything else—if that convinces you beyond a reasonable doubt, then you can find LaMonica guilty. If that does not convince you beyond a reasonable doubt, and you find that the inferences that the Government asks you to draw are not inferences of sub-

stance but are inferences of surmise or speculation, then you should find him not guilty. These, again, I leave to you as the sole judges of the facts."

Obviously, the admission was mentioned, not as standing alone, but in the entire context of all the other evidence relating to LaMonica. It can only be concluded from the failure of defendant's counsel to take exception to the charge, or request an additional clarifying instruction when given an opportunity that he so understood the charge and expected the jury to

■ The defendants argue that the trial judge erred when analyzing 18 U.S.C.A. § 1952 for the jury in charging:

"Finally, they must be shown not only to have traveled with the requisite intent, but also to have performed some act which facilitates, which promotes, which carries on, or which manages that illegal activity. * * * that a lugger who travels in interstate commerce and discharges players facilitates the dice game; because, again, it is difficult to imagine a dice game without players; so that these are the elements which must be proven to you beyond a reasonable doubt."

The defendants say that a "lugger" who traveled and discharged players must have performed an additional act in order to be guilty of a violation of 18 U.S.C.A. § 1952.

We cannot agree with the defendants' reading of the statute. Section 1952, it is true, requires more than travel across state lines with an intent to promote the unlawful activity. But an act subsequent to the travel between states which is an attempt to promote, or which promotes the game is sufficient to complete the violation. Completion of the 60-mile trip and discharge of passengers at the destination is sufficiently separate from the travel interstate to be considered a "thereafter" act. The defendants made no objection to this part of the charge. It is not plain error.

The court instructed the jury with respect to Barrow, Pillo, Bonanno and Loscalzo:

"If you find that any of these were not aiders and abettors, but if you find that they were co-conspirators, as I have defined that term, and if you find the requisite proof of guilt for that, they may nevertheless be convicted of the substantive crimes, because a coconspirator may be found guilty of the substantive crime committed by other alleged co-conspirators, if that has been shown to you—that is, if the proof of the substantive crime, if their knowing and willful participation in the conspiracy, has been shown to you beyond a reasonable doubt."

This portion of the charge was based on Pinkerton v. United States, 328 U.S. 640, at page 647, 66 S.Ct. 1180, at page 1184, 90 L.Ed. 1489 (1946), where the Court said:

" * * * so long as the partnership in crime continues, the partners act for each other in carrying it forward. * * * The governing principle is the same when the substantive offense is committed by one of the conspirators in furtherance of the unlawful project. Johnson v. United States, 9 Cir., 62 F.2d 32, 34. The criminal intent to do the act is established by the formation of the conspiracy. Each conspirator instigated the commission of the crime. The unlawful agreement contemplated precisely what was done. It was formed for the purpose. The act done was in execution of the enterprise. The rule which holds responsible one who counsels, procures, or commands another to commit a crime is founded on the same principle. That principle is recognized in the law of conspiracy when the overt act of one partner in crime is attributable to all. An overt act is an essential ingredient of the crime of conspiracy under § 37 of the Criminal Code, 18 U.S.C.A. § 88 [7 F.C.A. title 18, § 88]. If that can be supplied by the act of one conspirator, we fail to see why the same or other acts in furtherance of the conspiracy are likewise not attributable to the others for the purpose of holding them responsible for the substantive offense."

However, the Supreme Court immediately went on to speak of elements in the absence of which guilt for the substantive crime could not attach to all conspirators:

"A different case would arise if the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." Id., 328 U.S. at 647, 648, 66 S.Ct. at 1184.

The court, in the present case, failed to instruct the jury that the substantive offense must have been committed in furtherance of the conspiracy within the scope of the project and not merely as an *unforeseen part* of the ramifications of the plan. The government seeks to fill this gap by arguing that the substantive offense was necessarily committed in furtherance of the conspiracy. The argument proceeds that under the court's charge as to conspiracy the jury had to find, as to each defendant convicted of conspiracy, that he knew that the interstate travel was a part of the conspiracy.

The difficulty with the government's position lies in the difference between the proof required for conviction on the conspiracy count and that required for the substantive conviction. It is true, as we pointed out above, that knowledge of the interstate aspects of the game is requisite to guilt of conspiracy. However, conviction could follow if the non-traveling defendants had knowledge that *one* of the New Jersey defendants traveled interstate with the requisite intent. This is not so as to the substantive counts as they relate to the non-travelers. Under

these, the Pennsylvania defendants would have to know that *each* of the non-residents was, in fact, a non-resident and did, in fact, travel interstate. Thus, the knowledge that would support the conspiracy conviction would not necessarily support a conviction for the substantive crimes alleged in Counts 3 through 26. Only if the particular travel by the named traveler could be reasonably foreseen by the non-traveling defendants could the jury convict on the count alleging that travel.

In United States v. Andolschek, 142 F.2d 503 (C.A. 2, 1944), Judge Learned Hand, in speaking of the scope of the conspiracy for which one can be convicted, said at page 507:

> " * * * That is of course an error: the scope of the agreement actually made always measures the conspiracy, and the fact that B. engages in a conspiracy with others is as irrelevant as that he engages in any other crime. It is true that a party to a conspiracy need not know the identity, or even the number, of his confederates; when he embarks upon a criminal venture of indefinite outline, he takes his chances as to its content and membership, so be it that they fall within the common purposes as he understands them. Nevertheless, he must be aware of those purposes, must accept them and their implications, if he is to be charged with what others may do in execution of them. * * * "

See also United States v. Crimmins, 123 F.2d 271, 273 (C.A. 2, 1941). Cf. United States v. Anderson, 101 F.2d 325, 332–333 (C.A. 7, 1939).

The jury was not instructed that knowledge or foreseeability of the particular act of interstate travel was a necessary element of conviction for *each* substantive count. Hence, the jury might have convicted those non-traveling defendants named in Counts 3 through 26 without finding the existence of the omitted element. Whether the jury's finding of guilt of the Pennsylvania defendants was based on the aiding and abetting por-

tion of these counts or the Pinkerton charge, we will never know. Because it may have relied upon the Pinkerton charge, the conviction under the substantive counts of the non-traveling defendants, Barrow, Loscalzo, Bonanno and Pillo (those counts where he was not charged with traveling) must be vacated if this motion is timely. See Grunewald v. United States, 353 U.S. 391, 415, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).

■ Defendants took no exception to this part of the charge nor did they suggest any modification or amplification. However, this omission in the charge was plain error and can be recognized by this court and the Court of Appeals despite the failure of defense counsel to object or except. The foreseeability of the substantive crime is a necessary prerequisite to holding all the conspirators guilty of the substantive crime. United States v. Andolschek, supra.

In Barry v. United States, 109 U.S. App.D.C. 301, 287 F.2d 340 (C.A.D.C., 1961, the trial judge, in defining the essential elements of the crime, had failed to charge that the government must establish that the defendant had knowledge that the check was forged. The error was not even raised by counsel on appeal. The court said, at page 341 of 287 F.2d:

> " * * * But the responsibility of instructing the jury upon the essential elements of a crime rests upon the court. Failure to meet this special responsibility of the court itself need not be overlooked by an appellate court because overlooked by counsel. * * * "

See also United States v. Max, 156 F.2d 13 (C.A. 3, 1946).

We can find no case which holds that the failure to charge on essential elements is not plain error. United States v. Malfi, 264 F.2d 147 (C.A. 3, 1959), is a different case. There the trial court charged the jury in the words of the statute. There is no indication that any of the essential elements of the crime were there omitted from the charge.

The motions of defendants Barrow, Bonanno and Loscalzo for a new trial on Counts 3–11 and 15–26 inclusive, will be granted.

The motion of defendant Pillo for a new trial on Counts 5–11 and 15–26 inclusive, will be granted.

The remaining motions for a new trial will be denied.

The defendants' motions for judgment of acquittal will be denied.

Counsel for the government will prepare an appropriate order consonant with the opinion.