**UNITED STATES of America**

v.

**Milton H. L. SCHWARTZ.**

**Cr. No. 20265.**

United States District Court
E. D. Pennsylvania.

March 22, 1966.

Drew J. T. O'Keefe, U. S. Atty., and Joseph H. Reiter, Asst. U. S. Atty., for plaintiff.

G. Fred DiBona, Philadelphia, Pa., for defendant.

VAN DUSEN, District Judge.

This case is now before the court on the above post-trial motions (N. T. 938–9 and Documents 54 and 55) after a second trial of this defendant has resulted in a guilty verdict.* The one-count indictment charges the defendant and Rudolph

---

* The jury was unable to agree on a verdict as to this defendant at the first trial.

R. Bregman with knowingly and unlawfully removing and concealing, on October 30, 1954, 18 trailers, property of Rudolph Motor Service, Inc., with intent to evade and defeat the collection of taxes assessed against that corporation (hereinafter called "taxpayer"). Mr. Bregman (hereinafter referred as "Bregman"), President of taxpayer, was convicted at the first trial and the background facts and legal issues are stated in United States v. Bregman, 306 F.2d 653 (3rd Cir.1962), cert. den. 372 U.S. 906, 83 S.Ct. 718, 9 L.Ed.2d 716 (1963), which affirmed the sentence imposed after the jury verdict.

The concealment and removal of the trailers was accomplished by a false book entry, which the Government contends was made by the accountant, at the direction of, or aided and abetted by, both Bregman and the defendant, who was the taxpayer's and Bregman's counsel. The principal evidence against the defendant was a written statement (Exhibit G–62) admittedly signed by Bregman after its preparation by his attorney and submitted by mail to the sentencing judge, so that it was received the day before Bregman was sentenced in September 1961, after he had been found guilty at the first trial (N. T. 373, 381–2). This statement contained the following wording: [1]

" * * * I am further sure that these entries were not made by me inasmuch as Milton H. L. Schwartz was representing me and taking a very active

part in the operations of the business at that time; that the entries were directed to be made by him."

This Exhibit was received in evidence, the above sentence being treated as substantive evidence (N. T. 397), and the trial judge used the following language in commenting on it to the jury (N. T. 1047–1048):

"I want to explain to you G–62, because this is one of the primary items of evidence on which the Government relies to prove the alleged concealment by this defendant. You remember, G–62 is the statement that was signed by Mr. Bregman on September 11, two days before he was sentenced by me for commission of this crime, and it was sent to me by his lawyer, and I had it there before me at the time of sentence. It was sent to persuade me to give him a light sentence, as his written statement of the view of what had happened at the time of this crime, for which he had been found guilty.

"After consideration of all the evidence, you will have to decide whether you accept the testimony of Mr. Bregman last week that he probably, and possibly another officer of Rudolph Motor Service, Inc., directed that the October 30, 1954, entry concerning repossession of the 18 trailers by the Strick Company be made,—that is what he testified here on the stand, that he did it, or possibly another officer of the taxpayer, but not Mr.

---

[1]. The complete sentence, containing this wording, and the following sentence are worded as follows (see G–62):

"* * *

"As far as the alleged transfer of the 18 trailers to Rudolph Freight Lines from the Rudolph Motor Service, I am further sure that these entries were not made by me inasmuch as Milton H. L. Schwartz was representing me and taking a very active part in the operations of the business at that time; that the entries were directed to be made by him.

"All the negotiations that were carried on with the Internal Revenue people were conducted by Milton H. L.

Schwartz and I was completely guided by his advice at that time.
/s/ Rudolph R. Bregman
Rudolph R. Bregman"

On a separate page stapled to the first page of G–62, dated September 11, 1961, this language appeared:

"It must be understood that my part in the business or businesses was that of keeping the trucks moving, and all financial and legal matters were handled by Mr. Schwartz. From time to time he would advise me as to what he was doing, but inasmuch as I was not familiar with these affairs, I merely acquiesced in what had to be done.
/s/ Rudolph R. Bregman
Rudolph R. Bregman"

Schwartz—since he said he would not let Mr. Schwartz make any decisions for him and his company,—that is what he told you here on the stand—or whether you are going to accept the statement signed by Mr. Bregman on September 11, 1961, in G–62, and submitted to the Court the next day, that the entries concerning the alleged transfer of the trailers to Rudolph Freight Lines from Rudolph Motor Service were directed to be made by Mr. Schwartz, who was taking a very active part in the operation of the business at that time. That is what he signed and submitted to me in September of 1961." [2]

■ Under the situation presented by this record, the admission of this sentence in G–62 as substantive evidence was proper under these principles underlying the hearsay rule and the exceptions to that rule.[3]

A. *Principle of Necessity* [4]

Without intending any criticism of Bregman, he was such an unsatisfactory witness in January 1966 [5] that there was a real necessity for using a statement which he conceded he had made previously with the assistance of an attorney (N. T. 381–382), rather than relying on the evasive, unresponsive and contradictory ramblings [6] of a witness who was apparently a very sick man. He had been in the hospital shortly before the trial and died on January 17, 1966, having testified during the week of January 3, 1966.

B. *Cross-examination*

Wigmore points out that when a witness who has made a prior statement is on the stand, that witness is subject to cross-examination. This language appears in § 1018(b) of III Wigmore, Evidence (3d Ed.), pp. 687–8:

> " * * * the theory of the Hearsay rule is that an extrajudicial statement is rejected because it was made out of Court by an absent person not subject to cross-examination. * * * There is ample opportunity to test him as to the basis for his former statement. The whole purpose of the Hearsay rule has been already satisfied. Hence there is nothing to prevent the tribunal from giving such testimonial credit to the extrajudicial statement as it may seem to deserve. Psychologically of course, the one statement is as useful to consider as the other; and everyday experience outside of court-rooms is in accord."

The jury knew that the witness had foreclosed detailed questioning about the statement by stating that he did not "recall" it (N. T. 374—see, also, Exhibit B, and N. T. 1048—see, also, Exhibit A,

---

2. The next two pages of the charge commenting on factors affecting the weight to be given to this Exhibit are set forth in Exhibit A.

3. If a strictly legalistic approach is taken, the witness used language which the jury could have accepted as an adoption of the statement. See Harman v. United States, 199 F.2d 34, 36 (4th Cir. 1952); Finnegan v. United States, 204 F.2d 105, 115 (8th Cir. 1953); United States v. Barrow, 229 F.Supp. 722, 728 (E.D.Pa. 1964). For example, at N.T. 382, he testified: "It [the statement] was * * * what happened." However, he was looking at the floor, around the courtroom, and appeared visibly upset so that the trial judge did not believe the jury should be permitted to find he adopted the statement after considering his testimony as a whole and his appearance on the stand.

4. See V Wigmore, Evidence (3rd Ed.) §§ 1421 & 1426.

5. Also, there was little other direct evidence on the point, since Mr. Girer only testified that an officer of the company had directed him to make the entry. At the end of § 1421(2), page 204, Wigmore recognizes that frequently courts allow hearsay statements to qualify as admissible when there is no true necessity, using this language: "The necessity is not so great; perhaps hardly a necessity, only an expediency or convenience, can be predicated. But the principle is the same." Mr. Bregman's condition at the January 1966 trial made the use of the statement in G–62 necessary in order to present as clearly as possible his information on a vital issue. The jury was not required to accept this statement.

6. See, for example, extracts from testimony in Exhibit B.

where the charge reminded the jury that "He said he could not recollect signing it"). Also, the jurors had the opportunity to observe the witness' demeanor.[7]

## C. Guarantees of Trustworthiness

In § 1422 of V Wigmore, Evidence (3d Ed.), pp. 204–205, this wording appears:

"We see that under certain circumstances the probability of accuracy and trustworthiness of [the] statement is practically sufficient, if not quite equivalent to that of statements tested in the conventional manner. * * *

* * * * * *

"b. Where, even though a desire to falsify might present itself, other considerations, such as * * * the fear of punishment, would probably counteract its force; * * *."

The following four guarantees of trustworthiness are considered important factors present with reference to this statement:

1. G–62 was prepared by Bregman's attorney. It can be assumed that a statement prepared by an attorney, who knew at the time he prepared it that it was to be submitted to a judge in connection with the sentencing of his client, would be carefully made.

2. An attorney is presumed to know, and to notify his client of, the law. Bregman's counsel in this case was undoubtedly aware of the penalty for submitting a false statement to the Government [see 18 U.S.C. § 1001, and United States v. Bramblett, 348 U.S. 503, 509, 75 S.Ct. 504, 99 L.Ed. 594 (1955)] and it is presumed that this was explained to Bregman by counsel.

3. It was signed by Bregman (N. T. 370–371 and 374).

4. Bregman himself admitted that he would not sign something that was known by him to be false (N. T. 382).

Also, it is noted that the statement was made at a time which was more than four years nearer the events involved than the time of trial, even though the date of the statement was almost seven years after such events.

The more recent cases and writers on the law of evidence favor the reception in evidence of prior statements of a witness. such as this one for the reasons stated under A–C above. See United States v. De Sisto, 329 F.2d 929 (2nd Cir. 1964), cert. den. 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964), and authorities cited in that case at pp. 933–934.[8] In United States v. Allied Stevedoring Corp., 241 F.2d 925, 933 (2nd Cir.1957), the court said:

"It is one thing to put in a statement of a person not before the jury: that is indeed hearsay bare and unredeemed. But it is quite a different matter to use them when the witness is before the jury, as part of the evidence derived from him of what is the truth, for it may be highly probative to observe and mark the manner of his denial, which is as much a part of his conduct on the stand as the words he utters. Again and again in all sorts of situations we become satisfied, even without earlier contradiction, not only that a denial is false, but that the truth is the opposite: 'The lady doth protest too much, methinks.' This is not to rely upon the statement as a ground of

7. See page 4 above, the last sentence of footnote 3, and Exhibit B.

8. The strong statement favoring admissibility of such prior statements appearing in III Wigmore, Evidence (3d Ed.), § 1018(b), pp. 687–8, has been cited with approval in Federal appellate court cases. See, for example, Chicago, St. P., M. & O. Ry. Co. v. Kulp, 102 F.2d 352, 358, 133 A.L.R. 1445 (8th Cir. 1939). Since Mr. Bregman affirmed the statement as his, no problem such as that presented in

Douglas v. State of Alabama, 380 U.S. 415, 419–420, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), is involved. Similarly, the situation before the court in Bridges v. Wixon, 326 U.S. 135, 153–154, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945), is quite different from that here, since the statement was signed and presented to a branch of the Government under circumstances where the knowing submission of such a false statement involved commission of a felony under 18 U.S.C. § 1001.

inference, taken apart from the sum of all that appears in court; it is to allow the jury to use the whole congeries of all that they see and hear to tell where the truth lies. We and other courts have a number of times allowed this course to be taken. Indeed to deny this is to hold that nothing that comes from a witness on the stand can be used in support of the issue except his words under oath: the rest of his conduct may be used to refute what he asserts, but for nothing else. In short, out of the whole nexus of his conduct before the jury, they may treat those words alone as affirmatively relevant."

Section 39 of McCormick on Evidence (1954) concludes an extended discussion of this point, saying at page 76:

" * * * as a class prior inconsistent statements, when they are so verified that their actual making is not in doubt are more reliable as evidence of the facts than the later testimony of the same witnesses."

Since the prior statement (G–62) was properly received as substantive evidence, under the terms of the charge and the situation presented by this record, the Motions for Judgment of Acquittal will

be denied (see, also, N. T. 277–278, 281, 285, 309–311).[9]

█ The record requires that the Motion for New Trial be denied for these reasons:

1. The receipt of G–62 into evidence with the explanation in the charge was not reversible error for the reasons stated above.

2. It was not reversible error to rule that the defendant could not attempt to impeach one sentence of G–62 by reading to the jury an isolated question and answer [10] from the transcript of the proceedings at the time of Bregman's sentencing in 1961. A reading of the transcript of the sentencing proceeding as a whole (Document 41 and Exhibit D–8) makes clear that the single question and answer relied on by defendant, when read alone, is misleading.[11] The former Assistant United States Attorney who made the statement was present in court (N. T. 860–871) and counsel for defendant had the opportunity to call him to the witness stand and offer this sentence through him, but he declined the opportunity to do this (N. T. 866).[12] If language of an Assistant

9. Although there is room for difference of opinion concerning the order of January 3, 1966 (Document 50), it is believed that the evidence at the first trial entitled the jury to find that this defendant was the dominating figure in handling the property rights of the defendant and to infer that he had been an active participant in making the concealing entry.

10. "THE COURT: In other words, the Internal Revenue Service takes the position that these statements of Mr. Bregman do not accurately reflect the facts, is that so?
"MR. PHELAN: That is so. * * *" (p. 12, Document 41, also filed as Exhibit D–8).
"These statements" (supra) refer to G–61 and G–62. G–61 was not offered in evidence in the present case.

11. At page 10 of Document 41 (also marked as Exhibit D–8), the Assistant United States Attorney made it clear that

the only portion of G–61 and G–62 which he intended to characterize as inaccurate was "information * * * to the effect that Mr. Bregman did not know what was going on, or words to that effect. * * *" The Government's position throughout these proceedings has been that both Bregman and Schwartz knew of the false entry. It is not inconsistent for the Government to contend that G–62 was inaccurate as to Bregman, but accurate as to Schwartz.

12. The former Assistant United States Attorney said, out of the presence of the jury on 1/10/66, " * * * I was trying to * * * show that he had knowledge [of the actions of the corporation]" (N. T. 866). " * * * I believe Mr. Bregman had knowledge, that if there was anything in the statement that indicated he had no knowledge whatsoever, then I would address myself to that alone" (N. T. 869).

United States Attorney made during a sentencing presentation could be offered in evidence at a second trial, without requiring such attorney to be called to explain it, he would have to make a complete, lengthy statement at every sentencing proceeding to be sure the Government would not be prejudiced later by having only part of its position presented at a later trial.

3. The record does not justify the grant of a new trial for any of the other reasons urged by defendant (see Exhibit C).[13]

An appropriate order, denying the post-trial motions, will be filed at the start of the sentencing proceeding, which shall take place on April 13, 1966, at 9:30 A.M. in the United States Court House, Philadelphia, Pa., by which date it is expected that a pre-sentence report will be available.

## EXHIBIT A

### EXTRACT FROM CHARGE OF THE COURT AT PAGES 1048–1049

"Now it is up to you to determine the testimony of Mr. Bregman. You saw him on the stand. You heard him say how upset he was at the time that his lawyer gave him this statement and he signed it. He said he could not recollect signing it, as I remember it here. He could not recollect signing it. He said, 'That is my signature, I must have signed it, but I was so upset then when I was coming up for sentence I just didn't know what I was doing.' You have got to consider all these circumstances in deciding whether you are going to accept that statement as the fact. What you have to determine is: did Mr. Bregman direct the entry, or did Mr. Schwartz, or did somebody else do it? The Government has got to prove Mr. Schwartz did it, prove that to you beyond a reasonable doubt, or he aided and abetted.

"The Government, of course, says this was a statement made back in 1961, only seven years after the event. Here he is testifying here on the stand at eleven or twelve years after the event.* His memory should have been better back in 1961. They point out that it is a crime for him to make a false statement to me at the time of sentence and that he should have certainly not made a false statement and would not have.

"The defendant, on the other hand, says that the fact of the matter is he is under great pressure at that time, anybody is under great pressure, and you heard him say here what great pressure he was under at that time.

"I think Mr. Bregman was, obviously, a very unsatisfactory witness. It is going to be a problem for you. It is what you think, not what I think. But he was certainly upset. He looked down at the floor, it seemed to me. He looked around. He did not seem to me to be very clear in what he was saying, but you have to evaluate it. You have to evaluate the condition which he was in as he was approaching the moment when I was either going to send him to jail or I was not, and how long was I going to send him to jail. You see, he knew I was going to consider all this, and he obviously knew that if I felt that Mr. Schwartz had done more of it than he had done, that I would not give him as heavy a sentence. I think there is no question about that. But you have got to evaluate all this. Read the statement, remember all the evidence."

## EXHIBIT B

Bregman testified in relation to Exhibit G–62 as follows: "This, again Your Honor, has got my signature on it; it is my handwriting, but I don't recall this letter" (N. T. 374). In response to the court's question, "Do you have any recollection as to the accuracy of this state-

---

13. As to the order of December 28, 1965 (Document 49), see United States v. Ewell, 86 S.Ct. 773 (Opinion of 2/23/66), and page 34 of transcript of hearing of 12/21/65 (Document 68).

* The trial judge repeatedly pointed out to the jury the difficulty of determining in 1966 what had happened in 1954 (see, for example, N. T. 670, 1038–1039 and 1062).

ment, particularly that sentence which I just called to your attention?" the witness answered, "No, sir" (N. T. 375). The witness further stated that he would not have signed a statement which was incorrect and he would not have signed a statement knowing that it was false (N. T. 381–382). Then the following appears in the transcript:

"BY MR. REITER: And this is your signature that appears here?

A. Yes.

Q. So that when these statements were signed by you they were in your own mind as the things occurred; is that not so?

A. Now let me put it this way: This —this is not even my language. I never used the word 'acquiesced.' I don't even know what it means. But this was written by an attorney, and it sounded what I wanted to say; so I signed the paper.

Q. This represented what you wanted to say at the time; is that not so?

A. Not what I wanted to say. I never

\* \* \*

Q. This represents what you did not want to say at that time?

A. It was—

MR. DiBONA: If your Honor please—

A. —what happened."

## EXHIBIT C

## SOME REASONS FOR NEW TRIAL ARGUED IN DEFENDANT'S BRIEF (DOCUMENT 66)

A. The defendant's contention that the Government acted improperly by calling Mr. Bregman in order to secure the admissibility of the statement "knowing that he would not involve Schwartz" (page 11 of Document 66) is not supported by the record. There has been no showing that the Government knew that Mr. Bregman would be such an unsatisfactory witness and, hence, clearly "unwilling" within F.R.Civ.P. 43(b).\*

B. There was nothing in the cross-examination of the Assistant United States Attorney, who acted in a proper way during the trial, which could justify the grant of a new trial. For this reason, the contention at pages 17 and 18 of defendant's brief (Document 66), under heading 2–C, is rejected.

C. Girer, the firm's bookkeeper, claimed on the stand that he had no present recollection as to who was responsible for making decisions at Rudolph in the period around October 1954. The Government read the following statement:

"First I shall read from G–49, testimony of Eugene I. Girer, taken in the office of the Intelligence Division, August 15, 1957, Question 202 and the answer:

"'Is there anything else you wish to add to this record?

"'A I would like to add that being there is a time element involved, I have answered these questions to the best of my knowledge. There may be some inaccuracies, but these are because of a time element and not because of ill intent.'

"Now I would like to read from G–50, testimony of Eugene I. Girer taken in the office of the Intelligence Division, December 17, 1957, Question and Answer 40:

"'What was the reason for setting up Rudolph Freight Lines at this time?

"'A I don't remember too much why it was set up. Mr. Schwartz would know it. I do know a new corporation was being formed with Mr. Bregman and Mr. Schwartz making the high-level decisions.'

"Now, the next thing I am going to read will be the certification:

"'I have carefully read the foregoing statement, consisting of thirty pages, which is a transcript of questions which were propounded to me and

---

\* F.R.Crim.P. 26 appears to make this rule applicable. Pages 5–6 of the Government's trial brief (Document 56) indicates that the Government believed, prior to the trial, that Mr. Bregman might adopt the statement (see footnote 3 above).

my answers to such questions, on the 17th day of December, 1957, at the office of the Intelligence Division, Room 1200–B, Gimbel Building, Philadelphia, Pennsylvania, relative to the tax matters of Rudolph Motor Service, Inc., and affiliated corporations.

" 'I hereby certify that the foregoing answers are true and correct and that I have made the corrections shown and have placed my initials opposite each correction, and that I have initialed each page of the statement.

Eugene I. Girer.' "

(N. T. 221–222)

The document was read by Mr. Reiter and it was admitted on the theory of past recollection recorded. United States v. Riccardi, 174 F.2d 883, 887 (3rd Cir. 1949).

Then, out of the presence of the jury, the above recorded past recollection was identified as G–52 (N. T. 268) and it was received in evidence (N. T. 659). However, subsequently, the trial judge suggested the withdrawal of Exhibit G–52 and its contents out of an abundance of caution, although the applicable authorities may well justify its admission into evidence. See *Riccardi*, supra.

The document marked G–52 was withdrawn (N. T. 968–976) and the jury was instructed by the court to disregard G–52 (N. T. 976–7). There is every reason to believe that the jury disregarded this evidence as instructed by the court. See Delli Paoli v. United States, 352 U.S. 232, 242, 77 S.Ct. 294, 300, 1 L.Ed.2d 278 (1957), where the court used this language:

"It is a basic premise of our jury system that the court states the law to the jury and that the jury applies that law to the facts as the jury finds them. Unless we proceed on the basis that the jury will follow the court's instructions where those instructions are clear and the circumstances are such that the jury can reasonably be expected to follow them, the jury system makes little sense. Based on faith that the jury will endeavor to follow the court's instructions, our system of jury trial has produced one of the most valuable and practical mechanisms in human experience for dispensing substantial justice."