UNITED STATES of America, Appellee,

v.

Francis J. DE SISTO, Defendant-Appellant.

No. 296, Docket 28342.

United States Court of Appeals Second Circuit.

Argued Jan. 23, 1964.

Decided March 20, 1964.

Certiorari Denied June 15, 1964. See 84 S.Ct. 1885.

Frank Serri, Brooklyn, N. Y., for defendant-appellant.

Raymond Bernhard Grunewald, Asst. U. S. Atty. (Joseph P. Hoey, U. S. Atty., Eastern District of New York), for appellee.

Before FRIENDLY and HAYS, Circuit Judges, and ANDERSON, District Judge.*

* Sitting by designation.

FRIENDLY, Circuit Judge.

On a former appeal, 289 F.2d 833 (2 Cir. 1961), we reversed De Sisto's conviction for hijacking a truck loaded with silk goods shipped from Japan, in violation of 18 U.S.C. § 1951, because of errors in the trial. After a new trial before Judge Mishler and a jury De Sisto was again convicted. His appeal raises questions as to the sufficiency of the evidence in the light of a change in the identification testimony of the truck driver on cross-examination, as to the evidentiary status of the driver's prior identification, and as to charges and omissions to charge. We affirm.

In the early afternoon of September 1, 1959, a truck containing 31 cartons of imported Japanese silk goods was hijacked ten or fifteen minutes after leaving Pier 38 in Brooklyn, while turning from Carroll into Hicks Street. Its progress there was blocked by an Oldsmobile parked at a 45° angle. A man, whom Fine, the truck driver, later identified as De Sisto, walked over from the Oldsmobile, climbed on the running board of the truck on the driver's side, and, with his face about 18 inches away, told Fine, "Look straight ahead, Wimpy, and do what you are told. Pull over to the curb. Don't touch the key. Put the brake on. Do as you are told or I will kill you." Fine complied. Later, as ordered, he descended from the truck, and was herded into the Oldsmobile where taped glasses were placed over his eyes. Two other men who had assisted in this maneuver drove him off to a remote area where he was left handcuffed to a tree.

There was evidence that on the same afternoon De Sisto telephoned the Clesto Auto Service in Brooklyn, operated by two partners, Cleveland and Stork, to rent a large truck; that he drove to the Clesto garage in a Chevrolet accompanied by another man; that he signed a rental contract for a Clesto truck, paid a $50 deposit and drove it off; that the other man drove off in the Chevrolet; that although the truck was to be returned on Friday, September 4, De Sisto called on Friday and again on Saturday, saying that the truck couldn't be returned because it was loaded with furniture which couldn't be moved until the place of prospective delivery was ready; that the FBI found the hijacked truck empty and abandoned on September 4; and that on Sunday, September 6, the authorities found in a Brooklyn garage the Clesto truck containing the 31 cartons of silk goods and nothing else.

De Sisto's chief defense was an alibi. He claimed that he made the telephone call from a restaurant at Eleventh Ave. and 68th Street between 3:13 and 3:15 P.M., a time corroborated by testimony given at the first trial by Cleveland, who had died in the interim,[1] whereas pier records showed that Fine had checked out with his truck at 3:00 P.M. As against this Fine testified, although with some contradiction in an earlier statement, that he had left the pier about 2:45 P.M. to 2:50 P.M. and the accuracy of the pier records was challenged. Also, at the new trial, Stork testified he had been the first to talk to De Sisto on the telephone and placed the call around 3:45 P.M. on the basis that De Sisto had appeared at the garage at 4 P.M. and that he had remarked to De Sisto what a short interval had elapsed between the call and De Sisto's arrival. The 4:00 o'clock arrival was verified by the notation of 4:15 P.M. as the time-out on the truck rental contract and by Cleveland's testimony that "the most the whole transaction could have taken" between the time De Sisto arrived and "the time I checked it out at 4:15 was the maximum of fifteen minutes." Beyond this De Sisto claimed that he had rented the truck for a friend, Joe Storch, who had joined him at the restaurant, had paid the $50 deposit and had given De Sisto $10 for signing the contract; that they had come to the garage in De Sisto's Pontiac with a license number differing from that which had been noted on the Chevrolet; and

---

1. Cleveland had said he had "a reason for remembering the time"; no one asked him what it was. De Sisto did not explain why he had noted the time·so precisely.

that Storch had driven the truck and De Sisto the Pontiac away from the garage.

■ Assuming as we do that the Government was required to adduce evidence sufficient that a reasonable juror could be convinced of the guilt of the defendant beyond a reasonable doubt, United States v. Kahaner, 317 F.2d 459, 467–468 (2 Cir.), cert. denied, 375 U.S. 836, 84 S. Ct. 74, 11 L.Ed.2d 65 (1963); United States v. Lefkowitz, 284 F.2d 310, 315 (2 Cir. 1960); United States v. Robertson, 298 F.2d 739, 741 (2 Cir. 1962); Cuthbert v. United States, 278 F.2d 220, 224 (5 Cir. 1960), we think it plain that the evidence we have summarized—and there was more that we have not—amply passed that test if Fine's identification held. Not seriously challenging this, appellant argues that the identification was destroyed and that the Government's case fell with it.

In his direct testimony, Fine, after relating how he had seen the face of the hijacker, made a positive identification of De Sisto, as he had done at the first trial. But on cross-examination, after admitting that he had noticed the arms of the man on the occasion of the hijacking, he said he had seen no identifying marks and specifically no tattoo marks upon them. Defense counsel then had De Sisto remove his jacket to reveal large tattoo marks on the outside upper and lower portions of his arms, which he concededly bore in 1959. On further questioning Fine stated he could not say that De Sisto was the man who jumped on his truck.

The Government set about to repair the damage on redirect. Over objection Fine was allowed to testify that on September 1, 1959, he had told the FBI that his assailant was "A man approximately six feet tall, round face, heavy lips, one day or two days growth of stubble on his face, apparently Italian, heavy set, I think around 200 pounds, 180, 190, something to that effect, sir"—apparently a good description of De Sisto. He also was allowed to testify that on September 5, at FBI headquarters, he had picked De Sisto out of a line-up of four men; that he had identified a photograph of De Sisto's face before the grand jury on September 17; that he had again identified De Sisto at the first trial in November, 1959;[2] and that he had identified a photograph of De Sisto's face in the United States Attorney's office shortly before the second trial. Further examination by both sides brought out that Fine had been told of the tattoo markings while he was being prepared to testify at the second trial and that when photographs of De Sisto's arms, taken at the line-up, were shown to him at his request, he had told the prosecutor that the man who jumped on the truck didn't have such marks and that he was now in doubt as to the identification—a doubt to which he adhered through a long examination. Two FBI agents who had attended the line-up testified, over objection, that De Sisto was then wearing a tee-shirt and that the tattoo marks were plainly visible.

■ We interrupt our discussion of the sufficiency of the evidence to consider appellant's objection to the receiving of Fine's prior identifications and the related testimony of the FBI agents. In the course of the Government's presentation of evidence of Fine's prior identifications, defense counsel sought an instruction to the effect that these could be considered only as bearing on Fine's present credibility[3] but not as substantive evidence. Receipt of this testimony without such a limitation is now claimed to have been error which was not cured

2. De Sisto had displayed his arms during his own testimony at the first trial, and argument was made as to Fine's failure to refer to this in his description to the FBI, but Fine was not cross-examined on the point.

3. The prior statements here at issue can be regarded either as inconsistent with and adversely affecting the credibility of Fine's partial recantation, or as consistent with and supporting the credibility of his identification on direct examination, cf. United States v. Forzano, 190 F.2d 687 (2 Cir. 1951).

when, several days later, the judge included in his charge a general instruction that an inconsistent statement by a witness "made prior to trial, not made under oath, is not to be considered as affirmative proof on the issue but only brought before you as impeaching testimony." Accepting that the charge would not correct the claimed error under the circumstances here presented,[4] we are thus confronted with the issue as to the evidentiary status of prior statements which, in United States v. Kahaner, supra, 317 F. 2d at 474, we were able to "leave for another day."

The rule limiting the use of prior statements by a witness subject to cross-examination to their effect on his credibility has been described by eminent scholars and judges as "pious fraud," "artificial," "basically misguided," "mere verbal ritual," and an anachronism "that still impede(s) our pursuit of the truth." Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv.L. Rev. 177, 193 (1948); United States ex. rel. Ng Kee Wong v. Corsi, 65 F.2d 564, 565 (2 Cir. 1933, Judge Swan); McCormick, Evidence 77 (1954); United States v. Allied Stevedoring Corp., 241 F.2d 925, 934 (2 Cir. 1957, Judge L. Hand). See also 3 Wigmore, Evidence, § 1018 (3d ed. 1940); ALI, Model Code of Evidence, Rule 503 (1942); Judge L. Hand in Di Carlo v. United States, 6 F. 2d 364, 367–368 (2 Cir.), cert. denied, 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168 (1925); and the ruling of Mr. Justice Van Devanter at the trial in United States v. Graham, stated in Morgan, supra, 62 Harv.L.Rev. at 194, fn. 39, aff'd 102 F.2d 436 (2 Cir.), cert. denied, 307 U.S. 643, 59 S.Ct. 1041, 83 L.Ed. 1524 (1939). The sanctioned ritual seems peculiarly absurd when a witness who has given damaging testimony on his first appearance at a trial denies any relevant knowledge on his second; to tell a jury it may consider the prior testimony as reflecting on the veracity of the later

denial of relevant knowledge but not as the substantive evidence that alone would be pertinent is a demand for mental gymnastics of which jurors are happily incapable. Beyond this the orthodox rule defies the dictate of common sense that "The fresher the memory, the fuller and more accurate it is. * * * Manifestly, this is not to say that when a witness changes his story, the first version is invariably true and the later is the product of distorted memory, corruption, false suggestion, intimidation, or appeal to sympathy * * * [but] the greater the lapse of time between the event and the trial, the greater the chance of exposure of the witness to each of these influences." McCormick, Evidence 75–76 (1954). As against this, we are bound by the admonition, in Bridges v. Wixon, 326 U.S. 135, 153–154, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945), against allowing "men to be convicted on unsworn testimony of witnesses—a practice which runs counter to the notions of fairness on which our legal system is founded."

Whether or not this ruling in Bridges v. Wixon will survive the attacks of scholars, see, e. g., Morgan, supra, 62 Harv.L.Rev. at 192–96; McCormick, Evidence 73–82 (1954), we do not think the Supreme Court meant to require rigid adherence to the much criticized orthodox rule in the situation here presented where the prior statements were themselves testimony before a grand jury or at a former trial or were adopted by such testimony. The Bridges opinion emphasized that the statements there received as substantive evidence were simply a stenographer's notes of an investigative interview, whose accuracy the witness denied. "A written statement at the earlier interviews under oath and signed * * * would have afforded protection against mistakes in hearing, mistakes in memory, mistakes in transcription. Statements made under those conditions would have an important safeguard—the fear of prosecution for perjury." 326 U.S. at

---

4. Apart from the lapse of time and the generality of the instruction, the charge was unsatisfactory on appellant's view of the law in that the only prior statements ruled out as affirmative proof were those not made under oath.

153, 65 S.Ct. at 1452, 89 L.Ed. 2103. These comments are inapplicable to testimony, transcribed by a court reporter, before a grand jury or at a former trial. Testimony at a former trial has already been once subjected "to the test of Cross-Examination" on which our law places primary reliance for the ascertainment of truth. 5 Wigmore, Evidence, § 1362 (3d ed. 1940). Both such testimony and evidence before a grand jury have had the sanction of what Wigmore calls the "prophylactic rules" relating to the oath and to perjury, influencing "the witness subjectively against conscious falsification, the one by reminding of ultimate punishment by a supernatural power, the other by reminding of speedy punishment by a temporal power." 6 Evidence, §§ 1813, 1831 (3d ed. 1940)—with the oath administered not in any perfunctory fashion but in a setting calculated to impress the witness with the gravity of the responsibilities assumed. And in the case of identification testimony, we think the exception to the orthodox rule which seems to be permitted by the Bridges opinion may properly embrace not only testimony so given but the even more probative consistent earlier identifications for which the witness has later vouched under oath in the secrecy of the grand jury room or at a former trial. See Judges L. Hand and Hough in Di Carlo v. United States, 6 F.2d 364, 366, 369 (2 Cir.), cert. denied, 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168 (1925); Judge A. N. Hand in United States v. Forzano, 190 F.2d 687 (2 Cir. 1961); 4 Wigmore, supra, § 1130; McCormick, Evidence, supra, 108–09.

The desirability of qualifying the orthodox rule to the extent indicated is illustrated by the circumstances of this case. The fact that Fine, only four days after the incident, had picked De Sisto out of a line-up with the latter's tattoos in full view, and had thereafter made a positive identification before the grand jury, at the first trial, and on other occasions, warranted a variety of inferences that would sustain his identification and discredit his doubts. It afforded a basis for the jury's thinking he had not in fact had an opportunity to observe these parts of De Sisto's arms during the hijacking; indeed Fine testified at the first trial that De Sisto had climbed onto the running board and with both hands had held onto the steel top frame of the cab— a position which would expose the insides, but not the tattooed outsides, of his arms to the driver. It could also be that with Fine's other preoccupations during the hijacking, the tattoo marks made no impression on him, or that though he had in fact recalled the marks at the line-up on September 5, 1959, he had forgotten them in the three and a half intervening years. It would be perfectly rational for the jury to decide that, for these reasons or for others not requiring mention, Fine's identification at the first trial and on direct examination at the second was more credible than the doubt he expressed about the tattoos. Consideration of such matters by a jury in a criminal case—the task which jurors are superbly equipped to perform—ought not be impeded by directing them to make a discrimination so elusive that it can scarcely be retained by a trained legal mind, let alone be applied by laymen in determining the guilt or innocence of an accused.

■ With the challenged evidence thus admissible, the attack on the sufficiency of the Government's case must fail. Fine's assertion that he had come to have a reasonable doubt over his identification would not require a reasonable juror to have one as to De Sisto's guilt, particularly when the identification testimony was taken with the other evidence implicating him.

■ Appellant's first complaint as to the charge concerns the judge's failure to make specific comment on the change in the identification testimony. We should not consider this to have been error even if proper request had been made or exception taken. The point had been made dramatically by defense counsel in cross-examination and was extensively argued in the summations; the jury could not possibly have thought that

the judge's entirely fair instruction on identification was meant to belittle an incident so deservedly featured. See United States v. Kahaner, supra, 317 F.2d at 479–482. Had the judge chosen to make specific comment, he could not properly have dwelt only on the aspect favorable to De Sisto but would also have had to state the countervailing considerations, and the net effect might have been less favorable to the defendant. In any event the lack of exception is decisive, F.R.Crim.Proc. 30, for reasons explained in United States v. Kahaner, supra, 317 F.2d at 478–479.

 The other criticisms relate to the instructions that a jury may reasonably draw the inference that a person in possession of recently stolen property participated in its theft, and that although De Sisto was not in actual possession of the goods, that inference could be drawn here if the Government proved beyond a reasonable doubt that he had constructive possession, which the judge defined as knowingly having "the power and the intention at a given time to exercise dominion or control * * *." Insofar as appellant claims that the only inference permitted from possession of recently stolen goods is guilty knowledge and not participation in the theft, it suffices to cite McNamara v. Henkel, 226 U.S. 520, 524–525, 33 S.Ct. 146, 57 L.Ed. 330 (1913). The contention that the case was not a proper one for drawing an inference from constructive possession likewise fails. Although the inference was not so strong as if the stolen goods had been found in a room to which no one but De Sisto had had access since September 1, the evidence that he had rented the truck and then had postponed its return on the basis of a wholly unsubstantiated excuse afforded ample basis for logical inference-drawing. Although the judge's explanation of constructive possession was brief, we see nothing wrong with it and what counsel asked was not that he expand it but that he withdraw it altogether.

Affirmed.