**UNITED STATES of America,
Appellee,**

v.

**John NUCCIO, Rosario Lupo, and William Curcurato, Defendants-Appellants.**

**No. 209, Docket 30656.**

United States Court of Appeals
Second Circuit.

Argued Nov. 30, 1966.

Decided Jan. 5, 1967.

Certiorari Denied May 15, 1967.
See 87 S.Ct. 1688.

Jerome Lewis, Brooklyn, N.Y., for defendants-appellants.

Jerome C. Ditore, Brooklyn, N.Y., (Joseph P. Hoey, U. S. Atty., E.D. New York), for appellee.

Before MEDINA, FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge:

A grand jury in the District Court for the Eastern District of New York returned a one-count indictment charging the three appellants, John Nuccio, Rosario Lupo and William Curcurato, of conspiring with Rose Carluccio, whose trial was later severed, and with Georges Henrypierre and Henri LaPorterie to import heroin into the United States contrary to law in violation of 21 U.S.C. § 174. After a short trial before Judge Rayfiel and a jury, all three defendants were found guilty and sentenced.

Henrypierre, an Air France steward for fourteen and a half years, was arrested at Kennedy International Airport in January, 1965, for carrying in his luggage a three kilogram package of heroin given him in Paris by Henri LaPorterie for delivery to Curcurato at the latter's apartment on 58th St. in Queens. As the Government's chief witness at the trial, he testified he had made approximately ten such deliveries to Curcurato, first at an apartment on 45th St. in Queens to which LaPorterie had given him a key, and later at the 58th St. apartment to which Curcurato had given him keys. On two occasion in 1963 Curcurato gave him money to take back to Paris. LaPorterie's direction was that after delivering narcotics to specified addresses in Brooklyn or Queens, Henrypierre was to call a New Jersey telephone number. This belonged to Rose Carluccio, who testified she had standing instructions from Nuccio to say that he would meet the caller the next day "in the same place." The rendezvous was the C.B.S. building on 7th Avenue in Manhattan. On some fifteen to twenty occasions, four or five of which Mrs. Carluccio corroborated, this procedure resulted in Nuccio's handing Henrypierre packages of money, from $20,000 to $70,000, which the steward would then deliver

to LaPorterie in Paris. Nuccio would ask about the latter's health, send greetings and inquire whether Henrypierre had been in Brooklyn or Queens. Lupo was the Brooklynite; Henrypierre testified to three or four deliveries to Lupo's apartment. On one such occasion, when he found Lupo sitting in a car outside the building, they drove off and picked up Nuccio; Henrypierre left the narcotics in the car with the two, who jointly sought news of LaPorterie's well-being. Henrypierre was compensated by LaPorterie for his services at the rate of $100 per kilo and at times the defendants also paid him $100 for taking money back to France. The Government adduced some evidence corroborating the testimony of Henrypierre and Mrs. Carluccio, although none of it directly showed criminality. Curcurato testified, admitting that Henrypierre had come to his two apartments in Queens but asserting that this was for gambling rather than delivery of narcotics. Nuccio and Lupo offered no evidence.

■■ The only challenge to sufficiency of the evidence is the rather standard claim that the proof showed two conspiracies—in this instance one involving the two Frenchmen with Nuccio and Lupo and the other solely with Curcurato—rather than the single conspiracy which the judge told the jury it must find in order to convict. The challenge fails. Nuccio's inquiries about deliveries in Brooklyn and Queens constituted evidence linking all three defendants. Regarded as verbal acts in furtherance of the conspiracy—reminders by Nuccio to Henrypierre that his job required him to make deliveries in Brooklyn and Queens and admonitions to go there if he had not yet done so—rather than as mere testimonial declarations—"I have colleagues in Brooklyn and Queens"—they were admissible against all the defendants even without other proof of common action. Lutwak v. United States, 344 U.S. 604, 617–619, 73 S.Ct. 481, 97 L.Ed. 593 (1953); United States v. Costello, 352 F.2d 848, 853–854 (2 Cir. 1965), cert. granted as to another point, 383 U.S.

942, 86 S.Ct. 1195, 16 L.Ed.2d 205 (1966). Whether or not these inquiries and the proof of deliveries to Lupo and Curcurato in Brooklyn and Queens would alone have been enough to prove a single conspiracy, the addition of the evidence that La-Porterie, who was known to all the defendants, had designated Nuccio as paymaster in chief, sufficed to link both Curcurato and Lupo in the overall operation. As Judge Hincks said in United States v. Stromberg, 268 F.2d 256, 264 (2 Cir.), cert. denied, 361 U.S. 863, 80 S.Ct. 123, 4 L.Ed.2d 102 (1959), "from such evidence it might rationally be inferred that one joining such a consipracy knew that it had a scope and that, for its successful operation, it required a wide-spread organization, more comprehensive than may have been disclosed by any contact or transaction of which he had knowledge through his actual personal participation." See also United States v. Borelli, 336 F.2d 376, 382–384 (2 Cir. 1964), cert. denied sub nom. Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). We therefore turn to the claims of errors in the course of the trial and in the charge.

 The first of these was the court's refusal to allow Henrypierre to be cross-examined as to homosexual advances to Curcurato allegedly made and repulsed. While it would indeed have been wrong to permit cross-examination on the score of homosexuality merely to discredit Henrypierre's character, United States v. Provoo, 215 F.2d 531, 535–537 (2 Cir. 1954), the narrower proposal to interrogate concerning repulsed homosexual advances to one of the defendants went to the witness' bias and motive, and should have been allowed. Tla-Koo-Yel-Lee v. United States, 167 U.S. 274, 17 S.Ct. 855, 42 L.Ed 166 (1897); United States v. Masino, 275 F.2d 129, 132 (2 Cir. 1960); United States v. Barash, 365 F.2d 395, 400–401 (2 Cir. 1966); McCormick, Evidence 83 (1954); 3 Wigmore, Evidence § 950 (1940 ed.). However, Curcurato testified in considerable detail to the homosexual attempt and Henrypierre's threat to "get" him be-cause he repelled it; also Henrypierre was called in rebuttal and denied the episode, and Curcurato's counsel cross-examined in an unsuccessful effort to show that the denial was contrived. There is no reason to suppose that cross-examination immediately after Henrypierre's testimony in chief would have produced answers on his part more favorable to the defense. Neither do we find sufficient basis for reversal in Curcurato's contention that he should have been permitted to ask Henrypierre whether he was a homosexual on the theory that an affirmative answer would have lent credence to the defendant's version of the facts. Admission by Henrypierre of some homosexual tendency would have gone only a small way toward proving that he approached Curcurato and that his approach was violently repelled. Weighed against the rather slight probative value, the adverse effect of such evidence in improperly discrediting and embarrassing the witness justified the trial court in excluding it. See 3 Wigmore, Evidence § 951 (1940 ed.).

The judge's refusal to charge that allegedly inconsistent testimony by Henrypierre in the trial of other defendants for a narcotics offense in the Southern District of New York should be considered as affirmative evidence and not merely as affecting credibility is contended to run counter to our decisions in United States v. DeSisto, 329 F.2d 929 (2 Cir.), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964), and United States v. Borelli, supra, 336 F.2d at 391 & n. 11. After eliminating instances where no inconsistency existed, the argument comes down to this: Henrypierre testified at the instant trial that over the years he had delivered narcotics to four people whereas in the Southern District he had given the number as two, one being Charles Hedges and the other having an appearance different from any of the defendants; and whereas at this trial he testified to deliveries to Curcurato and Lupo in 1964, he said in the Southern District that in that year he had made deliveries to only one person, presumably either Hedges or the other man mentioned

above.[1] His explanation of the apparent discrepancy was that his testimony in the Southern District was directed only to the group and the events he thought were involved in that trial.

■ Although counsel refers to *De Sisto* and *Borelli* as if they enunciated the same principle, this is not at all the case. In *Borelli* we merely adhered to the established doctrine that when a witness specifically reaffirms the truth of something he had said elsewhere, the earlier statement constitutes evidence as fully as what he says on the stand. Citing many cases, we pointed out that "This principle long antedates and is quite different from our decision in United States v. De Sisto * * *." See also United States v. Persico, 349 F.2d 6, 12 (2 Cir. 1965). However, a witness scarcely reaffirms the truth of a prior statement within the meaning of this rule when he says that, although the statement was true, it was not directed to facts now at issue. The rule, for example, would not require equating the affirmation of a previous statement that the witness had never seen John Doe with trial testimony that he had, if the former statement related to an earlier period.

*De Sisto* dealt with the harder problem where a witness called to establish a fact in the proponent's case denies the fact or knowledge of it although, as the proponent then proves, he had testified to it before a grand jury or at a former trial concerned with the self-same issue. We sustained the trial court's refusal to instruct in such a case that the former testimony could be considered only as impeaching the witness' current denial of the fact or of knowledge and not as affirmative evidence. Where the proponent thus impeaches his own witness on the basis of prior inconsistent statements, he will not have sustained his burden unless the trier takes the next steps of believing the fact to be the opposite of what the witness testified, cf. Dyer v. MacDougall, 201 F.2d 265, 269 (2 Cir. 1952), and, particularly when the witness now professes to have no knowledge at all, of considering it to be what he had previously said. We thought that when the prior statements took the form of testimony to a grand jury or at a former trial on the very matter *sub judice*, the likelihood of a jury's short-cutting this process was so overwhelming that it was best to conform the instruction to the realities rather than confuse the jury by telling it to perform an impossible task, the opponent being adequately safeguarded by the circumstances under which the former testimony was given and the opportunity for immediate cross-examination. Compare United States v. Schwartz, 252 F.Supp. 866 (E.D.Pa.1966).

■ The problem, here presented, where the witness testifies to a fact useful to the proponent which a cross-examiner claims he had previously denied, is rather different. In such a case the "orthodox" rule that "Prior Self-Contradictions are not to be treated as having any *substantive* or *independent testimonial value*," 3 Wigmore, Evidence § 1018 at 688 (3d ed. 1940), does not place the judge in the unworthy position of telling the jury to do the opposite of what he expects it will; it is quite possible for the jury to discredit the witness simply because of "the repugnancy of his evidence," 3 Wigmore, supra, at 686–87, quoting Chief Baron Gilbert, and thus to regard him as an unreliable fellow, without deciding that the earlier statement was the true one. In such cases the opponent accomplishes a large part of his objective, and often—particularly in

---

1. Henrypierre was also taxed with an inconsistency between his testimony at trial and that before a grand jury in the Eastern District: Whereas he stated at the trial that his deliveries to Curcurato's 45th St. apartment began in the spring of 1963, he had told the grand jury that his first delivery was in the fall, whether of 1962 or 1963 he could not remember. Defense counsel made no request that the judge charge that this grand jury testimony should be accepted as affirmative evidence, doubtless for the excellent reason that either version was equally damaging.

criminal cases—all of it,[2] if the self-contradiction destroys the testimony, without the further step of converting the proponent's witness into his own by having the jury accept the earlier statement as the truth despite the later contradiction. While we do not say that the *DeSisto* principle could never be invoked in such a case, compare United States ex rel. Ng Kee Wong v. Corsi, 65 F.2d 564 (2 Cir. 1933), we would be loath to disturb a trial judge's refusal to do so. Moreover, and even more important, the earlier testimony here in question, unlike that in *DeSisto*, was not given at a former trial in the same case where the witness' mind was focused on the identical fact at issue in the later one. Although testimony at the trial of another case can properly be used for impeachment subject to such explanation as the witness may make, where the prior testimony was given in a different case with different parties involving different issues, a trial judge may properly consider the dangers to be too great to warrant the admission of the testimony as affirmative evidence. For that reason, as well as the lack of showing of prejudice, see fn. 2, we are unpersuaded by appellants' argument.

 While the judge correctly charged that the Government must prove as to each defendant that he "knowingly and wilfully joined the conspiracy during the period of its operation with the intent and the purpose of furthering its objective," he did not give further charges requested by defendants by which, in various ways, the jury would have been told that in determining a defendant's membership, it was "not to consider what others may have said or done" but was to decide "without regard to and independently of the statements and declarations of others." Although we do not

doubt that such instructions have often been given, all the law requires is that the jury find, on the basis of all evidence properly admitted by the judge, a conspiracy and each defendant's purposeful entrance into it. As indicated in our discussion of the single conspiracy issue, no preliminary showing is needed to allow the jury's consideration of what others have *done*, including "verbal acts," insofar as such acts show the conspiracy's existence and scope and the consequent likelihood of any defendant's being a part of it. For example, if Henrypierre's luggage had contained packages marked by LaPorterie for each of the three defendants, no one could reasonably doubt that the jury might consider this against each defendant, although it would not alone be sufficient for a conviction. And while a declaration of one alleged conspirator in furtherance of the conspiracy otherwise banned by the hearsay rule is not admissible against another without other proof of the latter's membership, the established rule in this circuit is that determination of the adequacy of such proof is for the judge and, if he is satisfied on that score, he is to leave the declaration "to the jury to use like any other evidence, without instructing them to consider it as proof only after they too have decided a preliminary issue which alone makes it competent." United States v. Dennis, 183 F.2d 201, 230–231 (2 Cir. 1950 (L. Hand, J.), aff'd, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951).[3] Accord, United States v. Pugliese, 153 F.2d 497, 500–501 (2 Cir. 1945); United States v. Stadter, 336 F.2d 326, 329–330 (2 Cir. 1964), cert. denied, 380 U.S. 945, 85 S.Ct. 1028, 13 L.Ed.2d 964 (1965); United States v. Borelli, supra, 336 F.2d at 387. Without detracting from our reaffirmation of this position, we note that

---

2. That was the situation here, since if Henrypierre's credibility was destroyed, almost nothing would remain of the prosecution's case.

3. Judge Hand in *Dennis*, supra, 183 F.2d at 231, made clear he was fully aware that "this conclusion permits the jury to act upon hearsay, because they may be satisfied of the 'joint undertaking' only because of the declaration." But he was satisfied, as are we, that "it often happens that hearsay is competent, and this is the only practicable way to deal with the question." See the helpful discussion by Judge Merrill in Carbo v. United States, 314 F.2d 718, 735–738 (9 Cir. 1963), cert. denied, 377 U.S. 953, 84 S.Ct. 1626, 12 L.Ed.2d 498 (1964).

no hearsay declarations appear to have been offered here; the notion that evidentiary use of anything emerging from the mouth is banned unless it comes within an exception to the hearsay rule is as fallacious as it is durable. See United States v. Costello, supra, 352 F.2d at 853.

 After reading the indictment to the jury, the judge also read certain pertinent provisions of 21 U.S.C. § 174. He told the jury that the section "provides that whenever a trial for a violation of this section takes place the defendant is shown to have had possession of the narcotic drug such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury"; that this "presumption" does not "relieve the Government of its obligation to prove every material element of this case beyond a reasonable doubt"; that if the jury believed Curcurato's testimony that he never had possession, "he doesn't owe any explanation"; and that the jury was to draw no inferences from the failure of Nuccio and Lupo to testify. While this did not follow what the Supreme Court and this court have characterized as the "better practice" of omitting explicit reference to the statute and simply telling the jury they may draw the inference from possession unless the evidence provides a satisfactory explanation, United States v. Gainey, 380 U.S. 63, 71 n. 7, 85 S.Ct. 754, 13 L.Ed.2d 658 (1964); United States v. Armone, 363 F.2d 385, 392–393 (2 Cir.), cert. denied, 385 U.S. 957, 87 S.Ct. 398, 17 L.Ed.2d 303 (1966), it would be hypercritical to fault the judge on that account in this case. The importance of the inference permitted by the statute is in relieving the Government of what would otherwise be the necessity of coming forward with evidence of knowledge of illegal importation in every case. The present was the somewhat unusual case where, as to all defendants, the Government's proof had covered precisely that. If the jury believed Henrypierre, the defendants knew they were conspiring to deal in illegally imported narcotics; if it didn't, there was no substantial evidence that they had conspired to deal in anything. With the bearing of this section of the statute so minimal, it would be absurd to reverse for a slight lapse from perfection in the instruction.[4]

 Appellants' complaint, not made at the trial, that the judge did not "marshal" the evidence, is frivolous. Any fair summary of the evidence could only have hurt them unless, perhaps, the judge were to have made an error that would have provided a ground for appeal. Appellants rely on United States v. Kelly, 349 F.2d 720, 757 (2 Cir.), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966), but this simple case is about as far as can be imagined from that complicated nine months trial on an indictment containing 160 counts and naming 20 defendants and 28 co-conspirators. Compare United States v. Kahaner, 317 F.2d 459, 479–480 n. 12 (2 Cir.), cert. denied, 375 U.S. 836, 84 S.Ct.. 74, 11 L. Ed.2d 65 (1963); United States v. Armone, supra, 363 F.2d at 404. We likewise find no merit in the claim that we should reverse because of the charge on reasonable doubt. After saying that a definition "as a doubt for which you can give a good reason" was "begging the question," and then making other remarks which are not criticized, the judge defined a reasonable doubt as

4. While the only package the Government was able to subject to analysis did not come into the physical possession of any of the defendants, we adhere to our holdings in United State v. Agueci, 310 F.2d 817, 828–829 (2 Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1016, 10 L.Ed. 2d 12 (1963), that no proof of actual dealings in narcotics is required to establish conspiracy to violate the narcotics laws and that when such proof is required, as in the case of a substantive count or in order to give rise to the statutory inference from possession, "just as with any other component of the crime, the existence of and dealing with narcotics may be proved by circumstantial evidence"— such as Henrypierre's admissions, the devious methods used, and the amount of money passed. Insofar as Cook v. United States, 362 F.2d 548 (9 Cir. 1966), may be to the contrary, we do not agree with it.

one "which you entertain in your mind after a careful consideration of all the evidence in the case which in your opinion would cause a prudent and reasonable and careful person to act in a manner which would be important to himself or herself." This is attacked as departing from our language in United States v. Johnson, 343 F.2d 5, 6 (2 Cir. 1965), "such a doubt as would cause prudent men to hesitate before acting in matters of importance to themselves." While the "hesitate" language makes the point considerably better and we wish trial judges would use it, we find it impossible to believe, in the absence of any evidence such as a request for further instructions, that jurors would retain such a nuance in their minds and be significantly influenced by it.

Affirmed.