**UNITED STATES of America**

v.

**Milton H. L. SCHWARTZ, Appellant.**

No. 15955.

United States Court of Appeals
Third Circuit.

Argued June 6, 1967.

Decided Feb. 23, 1968.

As Amended April 10, 1968.

G. Fred Di Bona, Philadelphia, Pa., for appellant.

Joseph H. Reiter, Asst. U. S. Atty., Philadelphia, Pa., (Drew J. T. O'Keefe, U. S. Atty., Philadelphia, Pa., on the brief), for appellee.

Before STALEY, Chief Judge, HASTIE, Circuit Judge, and SHERIDAN, District Judge.

## OPINION OF THE COURT

SHERIDAN, District Judge.

Defendant, Milton H. L. Schwartz, has appealed from a judgment of sentence following a guilty verdict in a jury trial on a one court indictment charging a violation of Section 7206(4) [1] of the Internal Revenue Code of 1954, 26 U.S.C.A. § 7206(4). This section makes removal or concealment of property upon which a levy is authorized by Section 6331 [2] of the Code a felony.

The indictment charged as follows:

"That on or about October 30, 1954, at Philadelphia, in the Eastern District of Pennsylvania, Rudolph R. Bregman and Milton H. L. Schwartz, with intent to evade and defeat the collection of taxes assessed against Rudolph Motor Service, Inc., did knowingly and unlawfully remove and conceal eighteen (18) Strick Trailers, property of Rudolph Motor Service, Inc., upon which a levy was authorized by Section 6331 of the Internal Revenue Code of 1954.

"In violation of 26 U.S.C. Section 7206(4)."

This trial in January 1966 was the second. In the first trial in June 1961, the jury disagreed as to defendant, but found Bregman guilty. The conviction was sustained on appeal. United States v. Bregman, 3 Cir.1962, 306 F.2d 653.

■ The jury having returned a guilty verdict, the evidence must be viewed in the light most favorable to the Government. United States v. Boyance, 3 Cir.1964, 329 F.2d 372. The evidence warranted the jury in finding the following facts. In 1951, defendant, an attorney experienced in taxation and corporate finance, became counsel for Rudolph Motor Service, Inc., an interstate trucking company in arrears in its tax liabilities to the United States. All the stock of Rudolph Motor was owned by its president, Rudolph Bregman. For several years defendant negotiated with the Internal Revenue Service in an attempt to prevent a seizure of the corporate property, particularly 18 trailers purchased from the Strick Company under a conditional sales contract and without which Rudolph Motor could not continue in business. Defendant, heavily in debt himself, received a large part of his income from Rudolph Motor and, consequently, it was in his interest as well as that of his client to protect the investment in the trailers. Beginning in January 1953, defendant and Bregman represented that planned expansion would produce revenues with which they promised to amortize the tax liabilities and urged Internal Revenue Service not to seize the corporate property. In October 1954, with payments to Strick in default and repossession threatened, defendant and Bregman negotiated an agreement with Strick under which the

1. Section 7206(4), "Fraud and false statements" reads in relevant part: "Any person who—* * * Removes, deposits, or conceals, or is concerned in removing, depositing, or concealing, any goods or commodities for or in respect whereof any tax is or shall be imposed, or any property upon which levy is authorized by section 6331, with intent to evade or defeat the assessment or collection of any tax imposed by this title; * * *."

2. Section 6331, "Levy and distraint" provides in relevant part: "(a) Authority of Secretary or delegate.—If any person liable to pay any tax neglects or refuses to pay the same within 10 days after notice and demand, it shall be lawful for the Secretary or his delegate to collect such tax (and such further sum as shall be sufficient to cover the expenses of the levy) by levy upon all property and rights to property (except such property as is exempt under section 6334) belonging to such person or on which there is a lien provided in this chapter for the payment of such tax. * * *"

trailers were transferred to the books and records of Rising Sun Truck Rental Co., a corporation in which defendant and Bregman were shareholders, directors and officers. Rising Sun agreed to bring the account up to date and make all future payments to Strick. Rudolph Motor was to continue to use the trailers and pay Rising Sun a rental equal to the installments due Strick. On October 30, 1954, the bookkeeper made a false entry in the books and records of Rudolph Motor that the trailers had been repossessed by Strick.[3] The Government contended that this entry supported a finding of removal or concealment to avoid seizure, and that the defendant caused or directed the entry to be made or participated in its preparation and, therefore, was guilty as an aider or abettor under Section 2 of Title 18 U.S.C.

The principal question on this appeal concerns testimony by Bregman. When asked by the Assistant United States Attorney on direct examination whether he had directed the bookkeeper to record the 18 trailers in the books and records of Rudolph Motor as having been re possessed by Strick, he replied, "I could have. Anybody of the three officers of our corporation, because we—." At this point the Government pleaded surprise and was permitted to cross-examine on exhibit G–62, a written statement signed by Bregman on September 11, 1961, in which he stated:

"* * * As far as the alleged transfer of the 18 trailers to Rudolph Freight Lines from the Rudolph Motor Service, I am further sure that these entries were not made by me inasmuch as Milton H. L. Schwartz was representing me and taking a very active part in the operations of the business at that time; that the entries were directed to be made by him." [4]

G–62 was prepared by counsel, signed by Bregman and mailed to Judge Van Dusen the day before Bregman was to be sentenced. Bregman did not remember signing it, although he admitted it was his signature, and he did not have any recollection of its accuracy. The court admitted the above part of G–62 [5] as sub-

---

3. When the books of Rudolph Motor were adjusted to reflect the repossession of the trailers, the explanation was "To record loss on Strick equipment by repossession of Strick Company for nonpayment of notes."

4. Rudolph Freight Lines was a corporation controlled by Bregman. The franchise of Rudolph Motor was transferred to it on January 17, 1955, but it does not appear in this record that the 18 trailers were transferred.

   It is difficult to find the inconsistency in G–62. The question was not raised in the district court or on this appeal. In view of our disposition, it will not be discussed.

5. The court charged the jury:
   "I want to explain to you G–62, because this is one of the primary items of evidence on which the Government relies to prove the alleged concealment by this defendant. You remember, G–62 is the statement that was signed by Mr. Bregman on September 11, two days before he was sentenced by me for commission of this crime, and it was sent to me by his lawyer, and I had it there before me at the time of sentence. It was sent to persuade me to give him a light sentence, as his written statement of the view of what had happened at the time of this crime, for which he had been found guilty.

   "After consideration of all the evidence, you will have to decide whether you accept the testimony of Mr. Bregman last week that he probably, and possibly another officer of Rudolph Motor Service, Inc., directed that the October 30, 1954, entry concerning repossession of the 18 trailers by the Strick Company be made,—that is what he testified here on the stand, that he did it, or possibly another officer of the taxpayer, but not Mr. Schwartz—since he said he would not let Mr. Schwartz make any decisions for him and his company,—that is what he told you here on the stand—or whether you are going to accept the statement signed by Mr. Bregman on September 11, 1961, in G–62, and submitted to the Court the next day, that the entries concerning the alleged transfer of the trailers to Rudolph Freight Lines from Rudolph Motor Service were directed to be made by Mr. Schwartz, who was taking a very active part in the operation of the business at that time. That is what he signed and submitted to me in September of 1961."

stantive evidence under the authority of United States v. De Sisto, 2 Cir.1964, 329 F.2d 929. We think this was error.

In De Sisto evidence of prior identification by a witness which was inconsistent with his testimony at a second trial was admitted as substantive evidence. The witness was allowed to testify that on the day of the crime he had given a description of De Sisto to the F.B.I.; that four days later he had picked De Sisto out of a lineup; that 13 days later he had identified a photograph of De Sisto before the grand jury; that he identified De Sisto at the first trial held within three months; and that he had again identified a photograph of De Sisto shortly before the second trial. The court noted that the orthodox rule that prior inconsistent statements can be used only for impeachment and not as substantive evidence has been severely criticized.[6] It weighed this against allowing "men to be convicted on unsworn testimony of witnesses—a practice which runs counter to the notions of fairness on which our legal system is founded." Bridges v. Wixon, 1945, 326 U.S. 135, 153–154, 65 S.Ct. 1443, 89 L.Ed. 2103 (footnotes omitted). The court emphasized that the prior statements were made or adopted under oath in a setting calculated to impress the witness with the gravity of the responsibilities assumed, with the important safeguards of the fear of prosecution for perjury, and that the testimony at the former trial had already been subjected to cross-examination. In United States v. Nuccio, 2 Cir.1967, 373 F.2d 168, 172, a nar-

cotics case, the court, referring to De Sisto, again emphasized the importance of these safeguards in upholding the district court which had refused to admit as substantive evidence the inconsistent testimony of a witness given at a trial of other defendants for a narcotics offense:

"* * * We thought that when the prior statements took the form of testimony to a grand jury or at a former trial on the very matter *sub judice*, the likelihood of a jury's short-cutting this process was so overwhelming that it was best to conform the instruction to the realities rather than confuse the jury by telling it to perform an impossible task, the opponent being adequately safeguarded by the circumstances under which the former testimony was given and the opportunity for immediate cross-examination. * * *

"* * * Moreover, and even more important, the earlier testimony here in question, unlike that in DeSisto, was not given at a former trial in the same case where the witness' mind was focused on the identical fact at issue in the later one. Although testimony at the trial of another case can properly be used for impeachment subject to such explanation as the witness may make, where the prior testimony was given in a different case with different parties involving different issues, a trial judge may properly consider the dangers to be too great to warrant the admission of the testimony as affirmative evidence. * * *"

---

6. "The rule limiting the use of prior statements by a witness subject to cross-examination to their effect on his credibility has been described by eminent scholars and judges as 'pious fraud,' 'artificial,' 'basically misguided,' 'mere verbal ritual,' and an anachronism 'that still impede(s) our pursuit of the truth.' Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv. L.Rev. 177, 193 (1948); United States ex rel. Ng Kee Wong v. Corsi, 65 F.2d 564, 565 (2 Cir. 1933, Judge Swan); McCormick, Evidence 77 (1954); United States v. Allied Stevedoring Corp., 241 F.2d 925,

934 (2 Cir. 1957, Judge L. Hand). See also 3 Wigmore, Evidence, § 1018 (3d ed. 1940); ALI, Model Code of Evidence, Rule 503 (1942); Judge L. Hand in Di Carlo v. United States, 6 F.2d 364, 367–368 (2 Cir.), cert. denied, 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168 (1925); and the ruling of Mr. Justice Van Devanter at the trial in United States v. Graham, stated in Morgan, supra, 62 Harv.L.Rev. at 194, fn. 39, aff'd 102 F.2d 436 (2 Cir.), cert. denied, 307 U.S. 643, 59 S.Ct. 1041, 83 L.Ed. 1524 (1939). * * *" United States v. De Sisto, 2 Cir. 1964, 329 F.2d 929.

In Taylor v. Baltimore & O.R.R., 2 Cir. 1965, 344 F.2d 281, the same court said: " * * * At the last term we followed that view [Dean Wigmore's] to the extent of upholding the reception as substantive evidence of inconsistent testimony of the witness at a former trial and before a grand jury (and also prior identifications vouched for in such testimony). United States v. De Sisto, 329 F.2d 929 (2 Cir.), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964). We went no further because we entertained doubts both as to whether we could, see Bridges v. Wixon, 326 U.S. 135, 153–154, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945), and as to whether, having in mind the ease of putting thoughts into the minds of prospective witnesses, we should. * * * "

■ In its opinion the district court justified the admission of G–62 on the "principles underlying the hearsay rule and the exceptions to that rule." It found a real necessity because Bregman was evasive, unresponsive and rambling and apparently a very sick man. He had been in the hospital shortly before the trial and died a few days thereafter. The court did not base its ruling on Bregman's health, so there was no opportunity to cross-examine on it. The record does not suggest that Bregman's health affected his mental processes so as to undermine his testimony. The court also found guarantees of trustworthiness, citing Section 1422 of 5 Wigmore, Evidence (3d ed.), pages 204–205, in that G–62 was prepared by Bregman's attorney who, knowing it was to be submitted in connection with the sentencing, can be assumed to have prepared it carefully; Bregman's attorney presumably apprised him of the penalty of submitting a false statement (18 U.S.C. § 1001); it was signed by Bregman and Bregman admitted he would not sign something known by him to be false. We think that any such guarantees were greatly outweighed by the circumstances that G–62 was made almost seven years after the events therein, in an obvious effort to obtain a light sentence,[7] was

---

7. The full text of G–62 is:

"September 11, 1961

"I, Rudolph R. Bregman, of 5908 Roosevelt Boulevard, Philadelphia, Pennsylvania, make this statement voluntarily and without any promise of any benefit from anyone.

"In connection with my indictment and trial for the removal of 18 Strick trailers from without the tax lien of the United States Government, I wish to state that at no time did I ever intend to defraud the Government of any taxes owed by me or by any company in which I was interested. I further state that the majority of my life has been spent in the operations end of the trucking business, and that the bookkeeping, accounting and legal end of the business has always been handled by someone else. At the time the Rising Sun Truck Rental Company was incorporated, I was represented by Milton H. L. Schwartz, and I am confident that it was his idea to incorporate the Rising Sun Truck Rental Company. Further, any entries on the books of the Rising Sun Truck Rental Company were not made by me or by my instruction. I am confident that such entries were made under the direction of Milton H. L. Schwartz. As far as the alleged transfer of the 18 trailers to Rudolph Freight Lines from the Rudolph Motor Service, I am further sure that these entries were not made by me inasmuch as Milton H. L. Schwartz was representing me and taking a very active part in the operations of the business at that time; that the entries were directed to be made by him.

"All the negotiations that were carried on with the Internal Revenue people were conducted by Milton H. L. Schwartz and I was completely guided by his advice at that time.

/s/ Rudolph R. Bregman
Rudolph R. Bregman
—1—

"It must be understood that my part in the business or businesses was that of keeping the trucks moving, and all financial and legal matters were handled by Mr. Schwartz. From time to time he would advise me as to what he was doing, but inasmuch as I was not familiar with these affairs, I merely acquiesced in what had to be done.

/s/ Rudolph R. Bregman
Rudolph R. Bregman
—2—"

not under oath, and there was no opportunity for cross-examination. The imminence of sentence alone was conducive to falsification rather than to truthfulness.[8] Even if we agreed with De Sisto, which we do not decide, the circumstances here would not permit its application.

■ The Government argues that Bregman adopted the statement. In its opinion the district court said:

"If a strictly legalistic approach is taken, the witness used language which the jury could have accepted as an adoption of the statement. See Harman v. United States, 199 F.2d 34, 36 (4th Cir.1952); Finnegan v. United States, 204 F.2d 105, 115 (8th Cir. 1953); United States v. Barrow, 229 F.Supp. 722, 728 (E.D.Pa.1964). For example, at N.T. 382, he testified: 'It [the statement] was * * * what happened.' However, he was looking at the floor, around the courtroom, and appeared visibly upset so that the trial judge did not believe the jury should be permitted to find he adopted the statement after considering his testimony as a whole and his appearance on the stand."

The refusal to permit the jury to find an adoption was a matter for the court's discretion, particularly in view of Bregman's testimony that he was "sky high," and very upset for a long time prior to and at the sentencing, he was attempting "to save his own skin," and he would "not let Milton Schwartz make any decisions for me or for my company. He would have to bring it up in front of me."

Another principal witness relied on by the Government to establish participation in the false entry was Eugene Girer, the bookkeeper for Rudolph Motor. Girer testified he made the entry at the direction of either Bregman or defendant. He could not recall which one told him the trailers had been repossessed or directed him to make the entry. Later he testified, "I—I really can not right now testify that Mr. Schwartz specifically gave me instructions to make a single entry into a book." Defendant contends the court erred in permitting Girer to answer three questions on cross-examination with respect to prior statements made by him to the Internal Revenue Service in August and December of 1957.[9]

8. The court said in its charge:
"* * * [Y]ou have to evaluate the condition which he was in as he was approaching the moment when I was either going to send him to jail or I was not, and how long was I going to send him to jail. You see, he knew I was going to consider all this, and he obviously knew that if I felt that Mr. Schwartz had done more of it than he had done, that I would not give him as heavy a sentence. I think there is no question about that. But you have got to evaluate all this. Read the statement, remember all the evidence."

9.
1. "Q Did Mr. Schwartz ever advise you what to do or not to do in matters of taxes?
"A In Matters of taxes? I don't know. I can't remember specifically yes or no. He advised me in all matters."
There was considerable discussion at side bar, and the court apparently ruled

this admissible but there is no indication that it was read to the jury.
2. "Q What was the reason for setting up Rudolph Freight Lines at this time?
"A I don't remember too much why it was set up. Mr. Schwartz would know it. I do know a new corporation was being formed with Mr. Bregman and Mr. Schwartz making the high level decisions."
This was read but later withdrawn with instructions to the jury to disregard it.
3. "Q Was any particular language used when you were given that direction [to make an entry recording the repossession of the trailers]?
"A I think I was told that there was a writ of replevin by Strick Company."
This was Girer's testimony from the stand. It did not come from a prior statement.
In its closing the Government argued "replevin" was a legal term and its use

Even if this testimony were in the record, we conclude there is insufficient evidence against defendant. There is ample evidence that Bregman removed and concealed the transfer of the 18 trailers with intent to avoid and defeat the collection of taxes. Bregman admitted the sufficiency of the evidence on his appeal, United States v. Bregman, supra. But the evidence against defendant is much different. Admittedly, defendant as counsel, negotiated the arrangements between Strick and Rising Sun under which Rising Sun paid Strick about $2,000 in back payments and made current payments of $500 a week. From time to time defendant made promises and proposals to the Government which his client did not keep. Defendant was a vice president and shareholder in Rising Sun, and counsel as well as financial adviser to Bregman and his companies. The evidence is clear that at all times the Government knew that defendant was acting in his professional capacity. As the court noted in its charge, most of the evidence was introduced as proof of intent. Participation in the false entry was critical to the Government's case. We have painstakingly searched the record and hold there was insufficient evidence of participation.

The indictment in March 1960 charged a criminal act on October 30, 1954. After two trials it must be presumed the Government has presented the best available evidence, and that it could not offer sufficient evidence in a third trial to sustain a conviction.

The judgment of the district court will be reversed with direction to enter a judgment of acquittal. See United States v. Weiler, 385 F.2d 63, 3 Cir., November 3, 1967.

was the same as the defendant leaving his calling card at the scene. The probative value of this evidence is questionable, see

1 Wigmore, Evidence §§ 28, 38 (3d ed. 1940).